In this wrongful death action, the plaintiff, James Luker, as administrator of the estate of Patrice Michele Luker, appeals from a judgment notwithstanding the verdict, which was granted in favor of one of the defendants, the City of Brantley. The jury had returned a $100,000 verdict against the City of Brantley. We reverse and remand with directions.
On October 15, 1982, at approximately 11:50 p.m., Patrice Michele Luker was killed when the automobile she was driving was struck head on by an automobile which was being driven by James Michael Patrick. Patrick's automobile had been traveling at a very high speed and on the wrong side of a double yellow line while going up a hill on U.S. Highway 331. Patrick was also killed in the collision.
In December 1983, James Luker, as administrator of his daughter's estate, filed a wrongful death action in Crenshaw Circuit Court. In this action, he named as defendants: Nicholas Clague, the owner of the automobile Patrick had been driving; Patrick; the City of Brantley; and the City of Luverne. The complaint was later amended so that it also included as defendants Brantley police officers Curtis Armstrong, James Ennis, and C. Collins Davis; the chief of police of the City of Brantley, Ralph Hamlis; and the chief of police of the City of Luverne, Jeff Mosley. Subsequently, Clague, the City of Luverne, Davis, Mosley, and Hamlis were dismissed. Although nothing in the record indicates that Patrick was ever dismissed, he was not proceeded against at trial.
At trial, Luker proceeded against the remaining defendants, the City of Brantley ("the City") and Officers Ennis and Armstrong, on the following theories:
(1) That Officers Ennis and Armstrong had negligently entrusted the automobile Patrick was driving to him with the knowledge that he was intoxicated and incapable of safely operating an automobile, or
(2) That the officers had negligently, or intentionally and/or wantonly, allowed Patrick to continue to operate an automobile while he was in an intoxicated state, or
(3) That the City, through its supervisory employees, had negligently failed to instruct these officers as to the proper manner in which to enforce the laws regarding intoxicated individuals.
Under each of these theories, Luker asserted that this wrongful action had proximately caused his daughter's death.
At the close of the plaintiff's evidence, the defendants moved for a directed verdict on numerous grounds. This motion was denied. In due course, the cause was submitted to the jury, and a verdict was returned against the City in the amount of $100,000. The jury returned a verdict in favor of the officers. The City filed a motion for judgment notwithstanding the verdict ("JNOV") or, in the alternative, for a new trial. The trial court entered an order in which it set aside the jury's verdict and granted the City's motion for JNOV. The trial court, however, did not rule on the alternative motion for a new trial. Luker appeals from the JNOV.
Reviewing the evidence in the light most favorable to the plaintiff, we find that the following is revealed:
On October 15, 1982, Nicholas Clague, Charles Evans, and James Michael Patrick left Fort Walton Beach, Florida, in Clague's 1972 Chevrolet Camaro automobile, with Clague driving, bound for Huntsville, Alabama. All three individuals had been drinking alcoholic beverages prior to leaving. Clague's Camaro was powered by an engine which was described in testimony as a 300-horsepower "balanced and blue printed 350 Chevrolet." It was estimated that the automobile was capable of obtaining a speed as high as 150 miles per hour. *Page 519 
As they began the trip, the three stopped by Patrick's trailer. From his trailer, Patrick took an "Igloo" cooler that contained at least two six-packs of beer. They placed the cooler in the back seat of the car and started up Highway 331 toward Huntsville. Clague was still driving the automobile, Evans was in the front passenger seat, and Patrick was in the back seat.
Before they reached the Alabama state line, the muffler on the Camaro came loose, and they stopped at a convenience store to get a coat hanger, and with it they reattached the muffler. While at this store, they purchased more beer. This beer was placed on the front floorboard of the car between Evans's feet. They again proceeded up Highway 331 toward Huntsville. At some point, the muffler again came loose, and they stopped, tore the muffler off completely, and left it on the side of the road.
By Evans's recollection, as he testified at trial, between 4:00 p.m. and the time they reached the Alabama state line, Clague had already consumed a six-pack of beer, Patrick had consumed at least one six-pack, and he, Evans, had consumed at least two six-packs. The empty cans had simply been tossed around in the car's interior.
The group reached Brantley, Alabama, at about 10:00 p.m., just about the time the last few carloads of people were leaving the Brantley High School parking lot after a football game. Officer James Ennis and Auxiliary Officer Curtis Armstrong had been "working the game" that night. As these officers came out of the high school parking lot, the Clague vehicle passed in front of them. They noticed that the car had no taillights and suspected, because of the loud noise, that it had no muffler. They pulled the vehicle over.
During the ensuing conversation with Clague, the officers asked Clague if he had been drinking. Although he apparently answered in the affirmative, the officers decided not to pursue the matter any further. Instead, after a brief discussion about the muffler and taillights, they allowed the three to leave in the vehicle.
A few minutes after this release, officers in a second Brantley police vehicle, who were returning from Luverne with a prisoner, observed the Clague vehicle traveling north on Highway 331 at approximately 95 miles per hour. Following the radio report of this sighting, Officers Ennis and Armstrong headed north in pursuit of the vehicle.
Before the officers caught up with them, however, the three had stopped at the Sunny South Convenience Store to purchase gasoline. According to the testimony of Billy Joe Wolfe, an employee of the store, all three of the men got out of the car and each placed an open can of beer on top of it. At about the time Wolfe had started out to ask them not to drink in front of the store, Officers Ennis and Armstrong arrived. Wolfe testified that the officers got out of their car, and that one of them walked up to the three men and poured each of the three cans of beer out onto the ground. The officers then began to arrest Clague. At some point, however, before the arrest was completed, Evans, who had gone into the store to pay for the gasoline, came out of the store and stumbled. A short time thereafter, during what was described as an argument between Evans and the officers, the officers threatened to arrest him for public drunkenness. However, even though Evans testified that he was "very intoxicated" at the time, no such arrest was made. Instead, the officers arrested only Clague, and they told Patrick that "if he could drive" he should take Clague's car and follow them to Luverne, where they were going to give Clague a photo-electric intoximeter (PEI) test.
At the Luverne Police Department, Clague was given the test and he registered .10 percent by weight of alcohol in his blood. Once these results were known, the officers again instructed Patrick to take Clague's car and follow them. This time, their destination was the Brantley Police Department, where they were going to "book" Clague.
At the Brantley Police Department, Clague was booked and jailed. The officers again asked Patrick if he thought he could *Page 520 
drive. Patrick responded in the affirmative. Thereafter, the officers asked Clague, whom they had just jailed for driving under the influence of alcohol, if it was okay for Patrick to take his car. Clague gave his consent. At about 11:15 p.m., Patrick and Evans were allowed to leave. At no time during their encounter with Patrick and Evans did the officers do anything more to determine the degree to which they were intoxicated. No tests were given to them and the vehicle was not searched or impounded. Instead, knowing that the two had been drinking alcohol, the officers helped them obtain an automobile and allowed them to leave.
At approximately 11:50 p.m., the Clague vehicle was involved in the accident which took the lives of both Patrice Luker and James Patrick. It was estimated that, immediately prior to the accident, Patrick had been traveling approximately 95 miles per hour. He had been on the wrong side of a double yellow line and had been attempting to pass another vehicle while going up a hill. The force of the impact knocked Patrice Luker's vehicle backwards about 85 feet. During the investigation of the accident, the standard traffic fatality kit was administered. When this sample was examined by the Alabama Department of Forensic Sciences, it showed that Patrick, at the time of his death, had a blood alcohol content of .10 percent by weight.
During the trial, it was revealed that, although they had each been appointed more than nine months before the fatal accident occurred, neither of the two officers, Ennis and Armstrong, had attended a recognized police academy as required by Code of 1975, §§ 36-21-46, et seq.
Mr. Seward Goss, head of the Alabama Department of Public Safety Academy, located in Selma, Alabama, testified that all approved academies are set up in conformity with certain "minimum standards" and that they all teach the same program concerning the subject of how to recognize and handle alcohol-related offenses. When Mr. Goss was asked, in the form of a hypothetical question, what the proper procedure would have been in this case, he responded that all three persons should have been arrested for public drunkenness and the vehicle should have been searched and impounded. Above all, he said, none of the subjects should have been allowed to leave the police station with the vehicle.
From these facts, we cannot escape the conclusion that Luker's claim that the officers, while acting in the line and scope of their duty, negligently allowed Patrick to operate the Clague vehicle while he was intoxicated and that as a proximate result of this negligence Patrice Luker was killed, was sustained by the evidence. The JNOV was granted erroneously.
Our decision that the actions of Officers Ennis and Armstrong, in and of themselves, constitute negligence for which a cause of action under § 11-47-190 may be sustained pretermits discussion of whether, in a particular case, the actions of the officers' superiors in failing to enroll them in the required minimum standards training programs could be considered the proximate cause of injury. Whether or not Officers Ennis and Armstrong had this training, it is clear that they acted negligently in allowing Patrick, under the circumstances of this case, to operate the automobile in an intoxicated state.
The City has strenuously asserted a number of arguments in support of the JNOV. Our examination of these arguments reveals some confusion as to what constitutes a proper ground for the granting of JNOV.
The City argues that the JNOV was proper because the verdict returned by the jury was inconsistent as a matter of law. It also argues that the JNOV was justified because the trial court erroneously read portions of Code of 1975, § 36-21-46, to the jury during its charge. We address the underlying merits of neither the argument that the verdict is inconsistent nor the argument that the reading of portions of § 36-21-46 to the jury was erroneous, as we determine that neither of these arguments, even if supported by the record, can support the granting of a JNOV. *Page 521 
A motion for JNOV is properly granted only when the movant would have been entitled to a directed verdict. Wright v.Fountain, 454 So.2d 520 (Ala. 1984). Such a motion tests the sufficiency of the evidence and, if granted, discloses that, without weighing the credibility of the evidence, there can be only one reasonable conclusion from the evidence as to the proper judgment. Morgan v. South Central Bell Telephone Co.,466 So.2d 107 (Ala. 1985).
On the other hand, the general rule is that, where a verdict in a civil case is inconsistent and contradictory, it should be set aside and a new trial granted. See generally, 66 C.J.S.New Trial § 66 (1950). Alabama adheres to this rule. See, e.g.,Ward v. Diebold, Inc., 486 So.2d 1261 (Ala. 1986); Wickham v.Cotten, 465 So.2d 388 (Ala. 1985); Sibley v. Odum, 257 Ala. 292, 58 So.2d 896 (Ala. 1952). Similarly, the giving of an erroneous charge to the jury requires a new trial. BeneficialManagement Corp. of America v. Evans, 421 So.2d 92 (Ala. 1982).
It is clear that the remedies of JNOV and new trial have distinctly different functions and that one may not be substituted for the other. Cf. City of Birmingham v. Andrews,222 Ala. 362, 132 So. 877 (1931). While the practice of Alabama's courts is not identical to that which is used in the federal system, the practices are similar enough that the following explanation, as set out in C. Wright A. Miller,Federal Practice Procedure, § 2531 (1971), is instructive:
 "A motion for judgment notwithstanding the verdict may be joined, in the alternative, with a motion for a new trial. These motions have wholly distinct functions and different standards govern their allowance. Nevertheless there has been confusion and some courts persist in stating, as the standard for a directed verdict or judgment notwithstanding the verdict, the much more lenient test that is applicable to a motion for a new trial on the ground that the verdict is against the weight of the evidence.
 "If a motion for a new trial is granted, the case is tried again. If a verdict is directed or judgment is granted notwithstanding the verdict, the case is at an end. Because of the finality that these latter motions have, it is natural that they should be measured by a far more rigorous standard. On a motion for new trial, the court has a wide discretion. On a motion for a directed verdict or for judgment notwithstanding the verdict, it has no discretion whatever and considers only the question of law whether there is sufficient evidence to raise a jury issue. On a motion for new trial the court may consider the credibility of witnesses and the weight of the evidence. On a motion for a directed verdict or for judgment notwithstanding the verdict, it may not." (Footnotes omitted.)
In light of these principles and authorities, it is clear that the appropriate remedy for the rendition of an inconsistent verdict is not a JNOV; rather, the appropriate remedy is a new trial. Other courts that have addressed the issue have reached the same conclusion. See, e.g., Farm BureauMutual Ins. Co. v. Sears, Roebuck Co., 99 Mich. App. 763,298 N.W.2d 634 (1980). Similarly, the appropriate remedy for the giving of an erroneous charge to the jury is a new trial. SeeBeneficial Management Corp. of America, supra.
Having reached these conclusions, we must consider this: Where possible grounds for a new trial have been argued in both the trial court and on appeal and a proper motion for a new trial has been made in the trial court but has not been ruled upon, may this Court ex mero motu remand this cause to the trial court with directions to reconsider and to rule upon the motion for new trial? We determine that we can.
It has always been generally recognized that an appellate court has the option of remanding a case to the trial court with directions to rule upon a motion for a new trial in situations where the entry of a JNOV has been reversed but the trial court has failed to rule on the motion for a new trial. *Page 522 
 "Where the trial court granted the motion for judgment n.o.v., but failed to rule on the motion for new trial, and the appellate court reverses the entry of judgment n.o.v., the appellate court may then: (1) order entry of judgment on the verdict; (2) order a new trial; or (3) remand the case to the trial court for reconsideration of the motion for new trial."
5A J. Moore J. Lucas, Moore's Federal Practice § 50.14 (2d ed. 1986). We hereby adopt this as the practice in Alabama. In doing so, however, in order to avoid any confusion, we specifically note that this practice is not inconsistent with this Court's recent decision in Ex parte Handley, 494 So.2d 24
(Ala. 1986) ("Handley II").
In Handley II, we recognized that it is error for a trial court not to rule on a motion for new trial. See also Rule 50(c)(1), A.R.Civ.P. However, we also held that this error had been waived, under the circumstances of that case, because the movant had not raised the issue of the trial court's failure to rule on its new trial motion in the earlier direct appeal. A careful reading of both Handley v. City of Birmingham,475 So.2d 1185 (Ala. 1985) ("Handley I") and Handley II is necessary in order to understand why the error was waived in that case but was not waived in the present case.
Handley had sued the City of Birmingham for negligence, and the jury had returned a verdict in favor of Handley. Judgment was entered in accordance with that verdict. The City of Birmingham filed motions for JNOV and for new trial. The trial court then granted JNOV, finding no evidence of proximate cause. Handley appealed only from the granting of JNOV. No mention was made by either party concerning the issue of a new trial. In Handley I, we reversed the JNOV, finding at least a scintilla of evidence on the proximate cause issue, and remanded the case.
Because the parties had not raised any issue concerning the propriety of a new trial and nothing about the case caused us to consider ex mero motu the new trial issue, the opinion simply omitted any discussion of the issue. Then, after the case had been remanded, the City of Birmingham again moved for a new trial before the trial court. This motion was granted.
Handley appealed and alternatively applied for a writ of mandamus (Handley II). For the first time, the parties brought to our attention that the alternative motion for a new trial had not been ruled upon as required by Rule 50(c)(1), A.R.Civ.P., when JNOV was granted. Handley contended, and a majority of this Court agreed, that because Rule 50(c)(1) gave the City of Birmingham a right to have the new trial motion ruled upon and because the City had failed to raise the issue in Handley I, the issue was waived.
The issue in Handley II was not whether this Court could haveex mero motu remanded the case for consideration of the new trial motion. The question was whether the trial court could grant a new trial after remand of the case from this Court without specific directions to do so. In Handley II, we held that the trial court had no such discretion to grant a new trial because we had not ordered it to do so. The applicable rules to be applied in such a situation were explained in Exparte Alabama Power Co., 431 So.2d 151, 155 (Ala. 1983) (cited in Handley II):
 " 'It is the duty of the trial court, on remand, to comply strictly with the mandate of the appellate court according to its true intent and meaning, as determined by the directions given by the reviewing court. No judgment other than that directed or permitted by the reviewing court may be entered. . . . The appellate court's decision is final as to all matters before it, becomes the law of the case, and must be executed according to the mandate, without granting a new trial or taking additional evidence. . . .' "
"5 Am.Jur.2d, Appeal and Error § 991 (1962).
 "In Kinney v. White, 215 Ala. 247, 110 So. 394
(1926), this court, in a second appeal of that case, noted that in the prior appeal it had reversed and remanded *Page 523 
the cause so 'that the trial court may proceed with the cause and render a decree according to the opinion of this Court.' 215 Ala. at 248, 110 So. 394. This court held the mandate meant exactly what it said:
 " 'The reversal was not one with mere general directions for a new trial, referred to by some of the authorities as an "unqualified reversal" (2 R.C.L. p. 290), but one with specific directions.
 " ' "Where * * * the cause is remanded with directions as to the judgment to be entered, such judgment should be entered without a new trial." 13 Ency.Plead. Pract. p. 854. "Where a particular judgment is directed by the appellate court, the lower court is not acting of its own motion, but in obedience to the order of its superior. * * * Public interests require that an end shall be put to litigation, and when a given cause has received the consideration of a reviewing court, has had its merits determined, and has been remanded with specific directions, the court to which such mandate is directed has no opower to do anything but obey, otherwise, litigation would never be ended." 2 R.C.L. p. 289.'
"215 Ala. at 248-49, 110 So. 394."
In light of the above discussion, we must conclude that where the issue of a new trial has arisen, as it has in the present case, before jurisdiction of the case has passed back to the trial court on remand with limiting instructions, a party's right to have its motion for a new trial ruled upon by the trial court has not been waived.
Therefore, the foregoing considered, the City's JNOV is reversed. This cause is remanded to the trial court so that the City's motion for new trial may be reconsidered by the trial court. Only those grounds argued herein may be considered in ruling on this motion. Discussion of all other issues is pretermitted.
REVERSED AND REMANDED WITH DIRECTIONS.
TORBERT, C.J., and MADDOX, JONES, SHORES, ADAMS, HOUSTON and STEAGALL, JJ., concur.
ALMON, J., not sitting.
 ON APPLICATION FOR REHEARING