Cessna Aircraft Company appeals from a judgment entered by the Montgomery County Circuit Court on a jury verdict in Robert Trzcinski's action for damages under the Alabama Extended Manufacturer's Liability Doctrine (AEMLD). The jury awarded Trzcinski $2.5 million in compensatory damages for the injuries he suffered and the medical expenses he incurred in an airplane crash. The jury also awarded $500,000 in punitive damages for Cessna's alleged wanton misconduct. The issue is whether Trzcinski met his burden of proving wanton misconduct by Cessna.
Trzcinski, a pilot with nearly 40 years' experience, was employed by "Farm Air" as a crop duster. On August 19, 1992, he was piloting a Cessna crop duster that crashed after coming in contact with electrical power lines. At the time of the crash Trzcinski was wearing a "shoulder harness safety restraint system" that had been manufactured by Cessna for use in the particular type of airplane he was flying, a Cessna AT188B.
The shoulder harness was on an "inertia reel" system that was attached to the wall of the cockpit behind the pilot's head and which operated essentially the same way a shoulder harness in an automobile works. The inertia reel system is designed to lock if there is a sudden stop or impact and to prevent the occupant from being thrown forward. In this case, when the airplane hit the ground the inertia reel locked; however, the shoulder harness separated at the juncture where the two shoulder straps are sewn together with the strap that is spooled on the inertia reel. This failure caused Trzcinski to be thrown forward by the force of impact and to strike his face on the instrument panel of the airplane. The impact with the instrument panel caused Trzcinski to be permanently and totally blinded.
On March 15, 1994, Trzcinski filed an action for damages, alleging negligence, wantonness, and liability under the AEMLD. The complaint also contained a count on behalf of Trzcinski's wife Lynn for damages for loss of consortium.
Pre-trial investigations revealed that the shoulder harness was in fact defective, in that two rows of required stitches were missing from this particular harness. Apparently, the Cessna seamstress who sewed this harness forgot to include a double row of stitching. As a result of this evidence, Cessna admitted liability under the AEMLD, but denied any wanton conduct that would justify the award of punitive damages.
Cessna moved for a directed verdict on the issue of punitive damages, at the conclusion of the plaintiff's case; it made a similar motion at the conclusion of the trial. Cessna *Page 19 
argued that Trzcinski had failed to present clear and convincing evidence that Cessna had acted wantonly in manufacturing or in inspecting the harness. The circuit court denied both of these motions and submitted to the jury the issue of wantonness and punitive damages. After the jury returned a verdict awarding punitive damages, Cessna moved for a judgment notwithstanding the verdict, challenging the award of punitive damages. On appeal, Cessna argues that Trzcinski failed to produce clear and convincing evidence of wantonness.[1]
The motion for a J.N.O.V. is a procedural device used to challenge the sufficiency of the evidence to support the jury's verdict. See, Rule 50(b), A.R. Civ. P.; Luker v. City ofBrantley, 520 So.2d 517 (Ala. 1987). Ordinarily, the denial of a directed verdict or a J.N.O.V. is proper where the nonmoving party has produced substantial evidence to support each element of his claim.[2] However, if punitive damages are at issue in a motion for a directed verdict or a J.N.O.V., then the "clear and convincing" standard applies. Senn v. Alabama Gas Corp.,619 So.2d 1320 (Ala. 1993).
Section 6-11-20(a), Ala. Code 1975, provides that punitive damages may be awarded in tort actions "where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in . . . wantonness" that caused injury to the plaintiff. "Clear and convincing evidence" is defined in the Code:
 "Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
Ala. Code 1975, § 6-11-20(b)(4).
Thus, the "clear and convincing" standard requires the trial judge to do more than merely determine whether the nonmoving party has presented substantial evidence to support the claim for punitive damages. It is not the trial judge's function when ruling on a directed verdict or J.N.O.V. motion to weigh the evidence; rather, he must view the evidence in a light most favorable to the nonmoving party. If in viewing the evidence in that light the judge reasonably can conclude that a jury could find the facts in favor of the nonmovant and that the jury could be firmly convinced of that decision after considering the evidence in opposition, then the judge should deny the motion.
We have thoroughly reviewed the evidence. We conclude that the circuit court erred in denying Cessna's motion for J.N.O.V. as to the award of punitive damages. Trzcinski failed to present clear and convincing evidence that Cessna's actions regarding the process of designing and manufacturing the shoulder harness constituted wanton misconduct.
"Wantonness" is defined by § 6-11-20(b)(3) as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Furthermore, this Court has held on more than one occasion that "wantonness" is not merely a higher degree of negligence; instead, it is a "qualitatively different tort concept of actionable culpability." LynnStrickland Sales Service Inc. v. Aero-Lane Fabricators, Inc.,510 So.2d 142 (Ala. 1987). While a party claiming wantonness does not have to prove an intent to injure, this Court has held that wantonness requires proof of some degree of conscious culpability. Yamaha Motor Co., Ltd. *Page 20 v. Thornton, 579 So.2d 619, 623 (Ala. 1991). See also, Hamme v.CSX Transportation, Inc., 621 So.2d 281 (Ala. 1993).
The defective harness was manufactured by Cessna in April 1989. In 1989, Cessna was manufacturing this particular type of restraint system only as needed for spare parts or as orders would come in for replacement harnesses. When an order was placed, a seamstress from the upholstery department would gather the necessary parts and then assemble the safety harness according to the following standards adopted by Cessna: The seamstress obtains an inertia reel, which has a strap spooled on the reel. She pulls out this strap and "sandwiches" it between two other straps that go over the pilot's shoulders. The three pieces are sewn together in a pattern described as "two rows of stitching around the outer perimeter and then two rows of stitching in a diamond pattern in the center of the perimeter stitching."[3] This "diamond pattern" stitching was omitted from Trzcinski's harness.
The deposition testimony of Delbert Griffith, a 35-year Cessna employee from the upholstery department, revealed that one seamstress performs the entire task of manufacturing a single harness and that it takes the seamstress about an hour and a half to assemble and sew the harness. The seamstress manufactures the requested number of harnesses, plus an additional harness; for example, if an order comes in for two harnesses, the seamstress actually manufactures three harnesses. One of the three harnesses is randomly selected and sent to "quality control testing," where it is placed in a machine and "pull tested" until it fails. The purpose of this test is to ensure that the harnesses meet the strength standards adopted by Cessna. The seamstress places the other two harnesses on an inspection table and someone from quality control inspects them.
A Cessna quality assurance supervisor testified through deposition, which was read in open court, that in 1989 written procedures called for the inspectors to conduct a four-part inspection of a harness or harnesses randomly selected from a lot that had been placed upon the inspection table. The supervisor testified that the defective harness was one of two harnesses in a lot and that the inspector inspected one of those harnesses and "visually looked at" the other one:
 "Q. So if I understand what you're saying is he [the inspector] would have seen the other belt there and maybe visually looked at it but as far as actually inspecting it to see that the stitching requirements were met, and the number of stitches per square inch, and the stitching pattern, he did not inspect that on this other one. He only did it on one and not the other one on 4-10-89?
"A. That is correct."
According to Cessna's process, if the inspected harness complies with the standards and the harness sent to quality control testing is satisfactory, then the entire lot is accepted by the inspector and the harnesses are sent to the spare parts department or distributed to the party who placed the order.
Trzcinski contends that this process exhibits a reckless or conscious disregard for the safety of the pilots who rely on the harnesses. He relies on several facts regarding the process in an attempt to picture Cessna's manufacturing process as an "archaic" system with little or no regard for the quality or safety of its harnesses. Trzcinski contends that the direct and circumstantial evidence presented in this case "prove[s] the elements of wantonness, including knowledge on the part of Cessna."
In his brief, Trzcinski reviews the facts that he claims constitute clear and convincing evidence of wantonness. He argues that the simple fact that the seamstress failed to sew the harness in accordance with the standards is enough to create a jury question on wantonness, because, he argues, she had knowledge that the failure to follow the standard was a "reckless disregard [of] the safety of pilots." However, there was no evidence presented that the seamstress knowingly left *Page 21 
out the stitching or acted with a conscious or reckless disregard in manufacturing the harness. Trzcinski also seeks to rely on the fact that Cessna did not have a seat belt department, but instead, used a seamstress from the upholstery department to manufacture the harnesses. However, there was no evidence that allowing the upholstery department, as opposed to a seat belt department, to manufacture the harnesses increased the possibility of defective harnesses. Nor was there any evidence that the upholstery department had produced any other defective harnesses.
Trzcinski disputes that this was a one-time isolated incident and contends that Cessna routinely failed to manufacture harnesses that conformed to Cessna's standards. He introduced four harnesses into evidence. One of the four was the actual harness used by Trzcinski, which was made in 1989 and which was obviously defective. The second was the harness manufactured in 1977 that Trzcinski had removed from the airplane and replaced with the defective harness; the third one was a harness manufactured in 1989 and taken off a sister plane at Farm Air; the fourth harness was one that Trzcinski's attorneys had purchased to use as evidence — it had been manufactured in 1994.
The alleged defect in the 1977 harness is that the "diamond-pattern" stitching does not show on the back of the sewn juncture as seen on the standard drawing, although it does show on the front of the sewn juncture. In contrast, the harness from the sister plane does have the diamond-pattern stitching on the front and back of the sewn juncture. The harness that was purchased by Trzcinski's attorneys does not have the inertia reel straps; instead, the straps are "stacked" with the inertia reel strap on the bottom. Trzcinski contends that these four belts prove that Cessna routinely manufactures harnesses that do not conform to its own standard.
In response, Cessna presented the testimony of Bob Wethington, an aeronautical engineer employed by Cessna since 1964. He conducts strength tests on various Cessna products, including shoulder harnesses such as those in question here to ensure that the products meet not only Cessna's standards but the standards of the Federal Aviation Agency (FAA) as well. Wethington testified that the three harnesses other than the one involved in Trzcinski's crash appear different because the manufacturing process has changed over the years. He explained that when the 1977 belt was produced the upholstery department utilized a two-step process in sewing the three straps together. He testified that the seamstress would pull out the inertia reel strap, lay one of the straps on it, run the two straps through the sewing machine, turn the straps over, and sew the other strap onto the inertia reel strap. After this process, the first stitches placed in the front strap would not show on the back strap. Wethington testified that by 1989 Cessna had begun to use a one-step operation wherein both shoulder straps were put in place and all the sewing was done at one time. As a result of this procedure, the diamond-pattern stitching would show on both sides of the sewn juncture. This evidence explains the distinction between the 1977 and 1989 harnesses. Wethington testified that harnesses made both ways were strength-tested and met the required standard.
In regard to the harness purchased by Trzcinski's attorneys, Wethington testified that after 1989 Cessna began "stacking" the straps, as opposed to "sandwiching," after someone in the upholstery department suggested the procedure to the engineering department. He testified that the engineering department tested several sample harnesses with the stacking procedure, that all the harnesses passed the test, and that the new procedure was implemented. Wethington did admit that Cessna had not changed the standard drawing to reflect this change; therefore, if someone compared harnesses made with the stacking procedure to the standard drawing, they would appear not to conform.[4] *Page 22 
Thus, the evidence presented by Cessna explains that these were intentional changes that represented a purposeful evolution in Cessna's manufacturing process.
Trzcinski also argues that actions taken by Cessna after his crash are further evidence that Cessna acted wantonly. He argues that Cessna continued to manufacture harnesses that did not conform to its own standards. He specifically refers to the fact that the upholstery department was stacking the belts instead of sandwiching them. However, as discussed above, the testimony of Bob Wethington explained this change.[5]
Trzcinski offered no evidence, expert or otherwise, indicating that Cessna failed to undertake safety-design engineering or that it was aware that its manufacturing process was likely to produce defective harnesses. Likewise, there was no evidence that the harnesses were prone to the kind of failure experienced by Trzcinski, or that there had been any reports of similar incidents in the past. Pitt v. Century II,Inc., 631 So.2d 235, 240 (Ala. 1993). In fact, the evidence presented by Cessna proved just the opposite.
Bob Wethington explained in great detail the amount of testing that was performed during the design phase of the model 188 shoulder harness and the steps taken by Cessna to ensure that the harnesses continue to meet the standards. He testified that when this harness type was being designed the FAA had a minimum requirement that shoulder harnesses be able to withstand a "nine g forward load" based on a 170-pound pilot. Cessna, however, adopted an enhanced "twenty-five g" standard based on a 200-pound pilot. Wethington testified that the engineering department developed the best geometrical design for the harness, and that Cessna then conducted numerous tests on the harness to ensure that the harness was strong enough to withstand the loads that the engineers intended for it to withstand. These tests involved placing the shoulder harness over a wooden torso mounted on a sled and applying to the harness a simulated forward load of 5,000 pounds. The model 188 shoulder harness passed all the tests and was certified by the FAA as meeting its minimum requirements. Next, Cessna developed a "standardized manufacturing assembly process" to guarantee that the harnesses produced by this process were exact duplicates of the one certified by the FAA. The FAA examined the process described earlier in this opinion and issued a "production certificate" allowing Cessna to produce the harnesses based on this process and to place them in airplanes.
Wethington also testified about the "lot testing," described above, which is performed every time the upholstery department receives an order for a replacement shoulder harness. He testified that the tests are performed to ensure that the "strength of the part has been retained" and that the seamstresses have not "forgotten how to make it [the harness] between the lots." During the time he had been employed at Cessna, no model 188 shoulder harness had ever failed the lot test. Wethington also testified that Cessna had never been notified that a model 188 shoulder harness, other than Trzcinski's, had failed in this manner. Cessna's testing and inspection procedures were approved by the FAA, and the evidence concerning these procedures would not support a finding, by clear and convincing evidence, that Cessna wantonly disregarded the need for safety and reliability of its safety harnesses.
Having carefully reviewed all of the evidence pertaining to the wantonness claim, we conclude that Trzcinski failed to produce clear and convincing evidence that Cessna exhibited a conscious or reckless disregard of likely injury in the manufacture of its safety harnesses, and in particular Trzcinski's safety harness. Because Trzcinski failed to present clear and convincing evidence that Cessna was guilty of wanton misconduct, the circuit court erred in denying Cessna's motion for a J.N.O.V. on the issue of punitive damages. Thus, insofar as it awarded punitive damages, the judgment is *Page 23 
reversed. The cause is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, SHORES, KENNEDY, INGRAM, COOK, and BUTTS, JJ., concur.
[1] Cessna's docketing statement filed in this Court originally listed excessive compensatory damages as one of the issues on appeal and it originally named Lynn Trzcinski as an appellee. However, Cessna, in its briefs to this Court, raises no issue regarding compensatory damages. The only issue briefed by Cessna regards the punitive damages award to Robert Trzcinski. Accordingly, our review in this case is limited to the punitive damages issue. Furthermore, the Court has dropped Lynn Trzcinski's name from the style of this appeal.
[2] A court applies the same standard when ruling on a motion for J.N.O.V. as when ruling on a motion for a directed verdict.Griggs v. Finley, 565 So.2d 154 (Ala. 1990).
[3] For a better understanding of the configuration of the model 188 shoulder harness involved in this case, we attach, as Appendix A, a diagram of the juncture of the two shoulder harness straps and the inertia reel strap.
[4] The harness from Trzcinski's airplane was sandwiched in accordance with the process in use in 1989, when it was made, and it matched the other 1989 harness except for the absence of the diamond-pattern stitching.
[5] Cessna argues that the post-accident evidence was erroneously admitted, but we make no ruling on this question. *Page 24 
 APPENDIX A
[EDITORS' NOTE: The figure IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 25