HARWOOD, Justice.
Robert Ferguson appeals from the order of the Jefferson Circuit Court granting a new trial to Baptist Health System, Inc. (“Baptist”), in his medical-malpractice action against it (case number 1022175). Baptist cross-appeals from the court’s order denying Baptist’s motion for judgment as a matter of law as to Ferguson’s wantonness claim and the associated punitive-damages award (case number 1030039). We affirm in case no. 1022175 and reverse and remand with instructions in case no. 1030039.
On May 21, 1999, Ferguson, then 73 years of age, fainted while working in his garage and fell, striking his head; he experienced a period of unconsciousness. He was seen initially at the emergency room of Carraway Methodist Medical Center. He was subsequently transferred, at the request of his regular physician, Dr. Virgil MeGrady, to Baptist Medical Center, Montclair, a hospital operated by Baptist *87 (“the hospital”). After Ferguson was admitted, Dr. McGrady called in Dr. James Strong, a neurologist, for a neurological consultation. Dr. Strong and his partners, Dr. Rodney Swillie, Dr. Dallas Russell, and Dr. Kyle Hudgens, thereafter were responsible for Ferguson’s neurological care.
Dr. Strong determined that Ferguson was experiencing seizure activity and on May 23 ordered that he receive intravenously a “loading dose” of one gram (1,000 milligrams) of Dilantin, an anticonvulsant medication, to be followed by the administration of 300 milligrams of Dilantin orally every night of Ferguson’s hospital stay. Dr. Strong ordered that a blood test be done the morning after the loading dose had been administered to ascertain the level of Dilantin in Ferguson’s blood; the test reflected a level of Dilantin in the blood of “13.1 mcg/ml,” which was within the therapeutic range of 10.0-20.0.
Pursuant to Baptist’s policy, the hospital pharmacy generated each day a “medication administration record” (“MAR”), which listed all of the medications prescribed for a particular patient by his treating physicians. The MAR generated for the 24-hour period following Dr. Strong’s order for Dilantin accurately reflected it, as well as all of the other physicians’ orders then on record for Ferguson. Dr. Strong’s order, and the corresponding MAR entry, used the conventional medical shorthand of “Dilantin 300 mg po QHS” to describe the dosage, method, and time of administration.[1]
Ferguson complained of severe back pain, and it was determined that he had experienced spinal compression fractures, although when they occurred was uncertain. He was also experiencing confusion, especially at night, and his personal history supplied by his family led Dr. McGrady to suspect that he was suffering from dementia as a result of Alzheimer’s disease. His treating physicians prescribed a variety of pain medications, Valium, and, starting on May 24, the drug Risperdal, described by Dr. Hudgens in his deposition as “an atypical antipsychotic medication ... used to treat confusion, agitation in a patient.”
On May 25, 1999, Ferguson was transferred to the rehabilitation unit of the hospital. For record-keeping purposes, this represented a “discharge” and a new “admission,” requiring a new set of physicians’ orders and resultant MARs. Dr. Hudgens entered an order on that date directing that Ferguson receive, in specified dosages at specified intervals, a number of different medications, including Risperdal, Valium, and Dilantin, the latter to be at the previously prescribed rate of 300 milligrams “po QHS.” A daily MAR was generated by the pharmacy for the “administration period” May 26 at 5:01 a.m. to May 27 at 5:00 p.m. Thirteen different medications were listed for Ferguson, along with their individual dosage levels and intervals of administration. The entry for Dilantin was a departure from Dr. Hudgens’s order, however. It read:
“PHENYTOIN 100 MG CAP (Dilantin) ORAL
“GIVE = 3 CAPSULES = 300 MG TID ANTI-CONVULSANT”
“Phenytoin” is the generic name for the brand name “Dilantin,” and the initials *88 “TID” (often written “t.i.d.”) are an acronym for the Latin phrase “ter in die,” meaning three times a day. Merriamr-Webster’s Collegiate Dictionary 1S06 (11th ed.2003). This MAR entry was readily susceptible of the interpretation that Ferguson was to be given three 100-milligram capsules of Dilantin 3 times a day, for a total of 900 milligrams daily. As the evidence presented at trial demonstrated, this is exactly how the nurses on the rehabilitation unit read and applied that MAR entry.
Consistent with hospital practice, the nurses who administered the various medications listed on the daily MARs “checked off,” by initialing on the MAR, the administrations of the medications for each shift during which a medication was given. From May 26 through May 31, Ferguson was given 300 milligrams of Dilantin 3 times a day for a total of 900 milligrams daily; on June 1, he was only given 2 doses, totaling 600 milligrams before he was discharged from the hospital.
Baptist had an internal policy, designed as a safeguard against possible pharmacy errors in transcribing physicians’ orders onto the MARs, that any time a new physician’s order for medication was entered, the nurse initially undertaking to administer the medication was responsible for comparing the MAR to the actual order to “reconcile” the two. Thereafter, the nurses successively administering the medication in accordance with the directions appearing on the MAR were not responsible for again reconciling the MAR entry with the actual physician’s order; thus, the reconciliation process was designed to take place only once, for any new orders entered within the previous 24 hours. In this case the error of the hospital pharmacy in its manner of entering Dr. Hudgens’s order for Dilantin on the MAR was not detected by the reconciliation process.
There was no testimony at trial concerning the identity of the pharmacist who erroneously transcribed Dr. Hudgens’s order for Dilantin onto the MAR. Anthony Czaplicki, the director of pharmacy and clinical practice at the hospital at the time of the trial, was not employed at the hospital during Ferguson’s hospitalization. Czaplicki testified that he had not been able to identify the pharmacist who had made the erroneous MAR entry because the computer system at the hospital had been upgraded on at least two intervening occasions and by law pharmacy records were required to be kept for only two years.
There was no direct evidence concerning how or why the pharmacy error occurred. Dr. Russell was asked by Ferguson’s counsel for his opinion as to how the pharmacy error might have occurred; he testified as follows, without objection:
“If I had to guess, I would say this happened: Dilantin is often given three times a day, and they chose to give three hundred milligrams at night. But frequently, when Dilantin is started, it is given a hundred, three times a day. I don’t — this is a guess on my part, because I don’t know what anybody was thinking. But it’s possible the person had three times a day in their mind, because it’s very common to give Dilan-tin that way. So they had three times a day in their mind, yet we had this three hundred all in one dose. That’s my guess as to how this occurred.”
There was no testimony concerning which nurse was responsible for undertaking the “reconciliation” between the MAR printed after Dr. Hudgens’s May 25 Dilan-tin order and the order itself, and there was no testimony concerning why or how the reconciliation process had failed to detect the pharmacy error. That is to say, there was no testimony as to whether a *89 reconciliation had been undertaken and improperly performed or whether the reconciliation had simply been omitted for some reason. All of the testimony at trial concerning the workings of the MAR process was elicited from Jerianne Rich, whom Ferguson called as a witness and who had worked as a staff nurse in the rehabilitation unit of the hospital during his stay there. She testified that she had never known of any occasion at the hospital when the reconciliation function had not been performed, because “it is just a practice that we did.”
When Ferguson was discharged from the hospital on June 1, Rich prepared and signed a prescription for his discharge medication, including Dilantin, to be administered at the rate of 300 milligrams 3 times a day. It was undisputed that nurses frequently wrote out prescriptions for discharge medications, but the physicians were expected to review and sign those prescriptions. Rich testified that she used the information from the MAR in writing out the prescription but that she also “called the doctor and verified the discharge medication.” She was not asked to identify the doctor she had telephoned to verify the dosing information, but references to the discharge prescription by Ferguson’s counsel during his questioning of Rich suggested that Dr. Russell was that doctor. The prescription itself is not a part of the record on appeal.
Rich explained that, as a nurse, she was not allowed to write a prescription, but that she could prepare a prescription when a patient was discharged “if the doctor had left ... or maybe had just forgot to write the prescription.” Dr. Hudgens testified that a nurse at the hospital was allowed to write a prescription, but not to sign it. Jeffrey Buckalew, Ferguson’s pharmacist for approximately 15 years, testified that the Fergusons came to his pharmacy on June 1, 1999, with the prescription for Dilantin. Buckalew testified that he was suspicious that the prescription was incorrect because “I’ve been practicing pharmacy 15 years, and I’ve never dispensed three capsules of Dilantin three times a day” and that he had “never dispensed a dose that high.” He attempted to contact Dr. Russell at his office, but Dr. Russell was not there, so Buckalew called the rehabilitation unit to see if Dr. Russell was there. Learning that Dr. Russell was not at the rehabilitation unit, Buckalew asked the floor nurse to check her records. He told her that “it says on here 3 capsules 3 times a day.” She checked the records and then advised him, “it’s 3 capsules 3 times a day, That’s what the 3 t.i.d. means.” Buckalew telephoned Dr. Russell’s office again and left a message for him, but he says Dr. Russell never contacted him. He filled the prescription, but it is undisputed that Ferguson never took any of the Dilantin capsules Buckalew supplied. Buckalew was not questioned about, and did not otherwise discuss, why he might have filled a prescription that was not signed by a doctor, but by a nurse.
On June 2, 1999, Ferguson’s daughter telephoned Dr. McGrady to report that her father was experiencing symptoms, including the inability to swallow his medications and to verbalize; Dr. McGrady instructed her to have Ferguson brought by ambulance to the emergency room of the hospital. After he arrived, a battery of tests was performed, including a check of the level of Dilantin in his blood. The level of Dilantin in his blood was found to be “54.4 mcg/ml,” indicating Dilantin toxicity. Dr. Russell speculated in his testimony that the reason Ferguson’s Dilantin level was checked on that occasion was that the physicians were looking for all possible causes of Ferguson’s “worsening like this.” Ferguson was admitted to the hospital, his Dilantin intake was stopped, and he was *90 started on fluids intravenously to hydrate him. Over the next week the level of Dilantin in Ferguson’s blood decreased sufficiently, and his condition otherwise improved, to the point where on June 9 he was transferred to the skilled nursing care unit; on June 12 he was discharged from the hospital. Ferguson’s Dilantin level had decreased to 29 by June 10, and as Dr. McGrady continued to check it after Ferguson’s discharge, it was 10 by July 12. It was Dr. McGrady’s opinion at trial that the symptoms Ferguson experienced on June 2 — difficulty in swallowing and talking and weakness — were the result of the Dilantin toxicity.
Ferguson sued Baptist on January 29, 2001, and as last amended, his complaint charged that Baptist and its agents, servants, and employees, had “negligently and/or wantonly failed to follow the standard of care and skill of the average qualified member of the profession practicing the specialty by the defendant, its agents, servants, and employees.... ” At trial Baptist acknowledged that one of its pharmacists had made an error in changing the Dilantin dosage interval on the MAR from “qhs” (at bedtime) to “tid” (three times a day). Baptist’s counsel asserted in his opening statement, however, that no evidence would be presented during the trial showing that anyone at Baptist had consciously disregarded Ferguson’s safety, so as to warrant an award of punitive damages. Similarly, Baptist asserted in its closing argument that although an error had been made in the MAR, which error had been compounded when the MAR was not properly reconciled by a nurse, those failures were simply the result of human error and that although “it was negligent for them to do that,” there was no proof of any consciousness on the part of anyone at the hospital that some act or omission was being done that would likely or probably cause injury.
Baptist timely filed a motion for a judgment as a matter of law at the close of Ferguson’s evidence, and, during a recess taken after both sides had rested, its counsel made the same argument he had made in his closing argument. Baptist clearly stated to the trial court its contention that, although the evidence might support a negligence claim, there was not substantial evidence indicating that Baptist had acted wantonly, let alone dear and convincing evidence of wantonness so as to allow the recovery of punitive damages. Baptist’s motion for a judgment as a matter of law was denied.
The case was submitted to the jury with instructions that Ferguson was claiming that Baptist “breached the standard of care required of a hospital” and that its breach was the proximate cause of Ferguson’s injury, and that Baptist “does not deny it breached the standard of care in administering Dilantin to [Ferguson],” but that it denied all Ferguson’s other claims. The judge instructed the jury that before Baptist could be found guilty of wantonness, “it must be shown that with reckless indifference to the consequences, ... it either consciously or intentionally did some wrongful act or consciously omitted some known duty which produced the injury.” Finally, with respect to Ferguson’s claim for punitive damages, the judge instructed the jury that punitive damages could be awarded if Ferguson had proved by clear and convincing evidence that Baptist “consciously or deliberately engaged in some type of wantonness in regard to [Ferguson].”
The jury returned a general verdict in favor of Ferguson, awarding Ferguson compensatory damages in the amount of $200,000 and punitive damages in the amount of $800,000. The trial judge entered a judgment for those amounts, and *91 Baptist timely filed a motion for a judgment as a matter of law, or, in the alternative, for a new trial or a remittitur. The trial judge denied Baptist’s motion for a judgment as a matter of law as to the wantonness claim and the punitive-damages award, concluding that the jury could have concluded from the evidence that Baptist “through its agents acted with a conscious disregard for the safety of Mr. Ferguson in failing to monitor his medication, knowing that such failure could result in Dilantin toxicity.” The judge concluded, however, that certain occurrences at trial had improperly influenced the amount of the compensatory-damages award, and that that award should be reduced to $25,000 and further found that the punitive-damages award should be reduced to $50,000. Ferguson was allowed 30 days to accept the remittitur or else a new trial would be granted. Ferguson timely filed a motion to alter, amend, or vacate that judgment, which was denied by order entered August 11, 2003. In that same order, the trial judge ruled that because Ferguson had failed to accept the remittitur, Baptist’s motion for a new trial was granted. Ferguson appealed and Baptist cross-appealed.
Although the parties raise numerous issues in their briefs to this Court, one issue is dispositive: whether there was clear and convincing evidence of wantonness on the part of Baptist so as to authorize the imposition of punitive damages. In Cessna Aircraft Co. v. Trzcinski, 682 So.2d 17 (Ala.1996), we discussed these pertinent principles:
“The motion for a J.N.O.V.[2] is a procedural device used to challenge the sufficiency of the evidence to support the jury’s verdict. See, Rule 50(b), [Ala.] R. Civ. P.; Luker v. City of Brantley, 520 So.2d 517 (Ala.1987). Ordinarily, the denial of a directed verdict or a J.N.O.V. is proper where the nonmoving party has produced substantial evidence to support each element of his claim. However, if punitive damages are at issue in a motion for a directed verdict or a J.N.O.V., then the ‘clear and convincing’ standard applies. Senn v. Alabama Gas Corp., 619 So.2d 1320 (Ala.1993).
“Section 6-ll-20(a), Ala.Code 1975, provides that punitive damages may be awarded in tort actions ‘where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in ... wantonness’ that caused injury to the plaintiff. ‘Clear and convincing evidence’ is defined in the Code:
“ ‘Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.’
“Ala.Code 1975, § 6-ll-20(b)(4).
“Thus, the ‘clear and convincing’ standard requires the trial judge to do more than merely determine whether the non-moving party has presented substantial evidence to support the claim for punitive damages. It is not the trial judge’s function when ruling on a directed ver- *92 diet or J.N.O.V. motion to weigh the evidence; rather, he must view the evidence in a light most favorable to the nonmoving party. If in viewing the evidence in that light the judge reasonably can conclude that a jury could find the facts in favor of the nonmovant and that the jury could be firmly convinced of that decision after considering the evidence in opposition, then the judge should deny the motion.
[[Image here]]
“‘Wantonness’ is defined by § 6 — 11— 20(b)(3) as ‘[.cjonduct which is carried on with a reckless or conscious disregard of the rights or safety of others.’ Furthermore, this Court has held on more than one occasion that ‘wantonness’ is not merely a higher degree of negligence; instead, it is a ‘qualitatively different tort concept of actionable culpability.’ Lynn Strickland Sales & Service Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142 (Ala.1987). While a party claiming wantonness does not have to prove an intent to injure, this Court has held that wantonness requires proof of some degree of conscious culpability. Yamaha Motor Co., Ltd. v. Thornton, 579 So.2d 619, 623 (Ala.1991). See also, Hamme v. CSX Transportation, Inc., 621 So.2d 281 (Ala.1993).”
682 So.2d at 19-20 (footnote omitted).
“““Wantonness’ has been defined by this Court as the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from the doing or omitting to do an act, injury will likely or probably result.” ’ ” Fox Alarm Co. v. Wadsworth, [Ms. 1020994, Jan. 14, 2005] — So.2d -, - (Ala.2005)(quoting McKenzie v. Killian, 887 So.2d 861, 871 (Ala.2004), quoting in turn Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1256 (Ala. 1998), and citing Bozeman v. Central Bank of the South, 646 So.2d 601 (Ala.1994)).
Ferguson argues that clear and convincing evidence of wantonness was established by evidence offered at trial tending to show: that on the MAR the hospital pharmacy had erroneously changed the description of the Dilantin interval of dosage; that a nurse’s reconciliation was not performed or that the reconciliation was improperly performed; that none of the nurses administering the Dilantin to Ferguson detected the error “due to the fact that there were no additional checks, balances, or other safeguards in place to prevent the repetition of such error”; that Ferguson exhibited classic symptoms of Dilantin toxicity, which are well known in the medical profession, but no one monitored the level of Dilantin in his blood; that no one ever checked the original physician’s order “despite the unusually large amount of Dilantin being administered”; that Rich “illegally signed the doctor’s name to the discharge prescription”; that Buckalew, Ferguson’s pharmacist, attempted to question the amount of Dilantin prescribed for Ferguson “but was ignored and treated rudely when he tried to question [Baptist] employees about the problem”; and that the “nurses and other hospital personnel never checked the PDR [Physicians’ Desk Reference] or their other computer systems to verify the dosage.” (Ferguson’s reply brief, pp. 25-26.)
In Coca-Cola Bottling Co. United, Inc. v. Stripling, 622 So.2d 882, 885 (Ala.1993), in differentiating between wantonness and negligence, this Court observed:
“ ‘Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; ... “Simple negligence is the inadvertent omission of duty; and wanton or willful misconduct is characterized as such by *93 the state of mind with which the act or omission is done or omitted.” ’ ”
(Quoting Lynn Strickland Sales & Serv., Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142, 145 (Ala.1987).)
It was Ferguson’s burden to prove that Baptist breached an applicable medical standard of care as to each asserted instance of wantonness. § 6-5-548(a), Ala. Code 1975. Because the respective standards of care underlying the alleged breaches would not be known and comprehensible to a layperson, Ferguson was required to produce expert medical testimony to establish each applicable standard and to establish that it had been breached. Tuck v. Health Care Auth. of Huntsville, 851 So.2d 498 (Ala.2002).
Dr. Russell’s testimonial surmise about the basis for the pharmacy’s error, otherwise unaccounted for at trial,' suggests nothing more than human error in the form of inattention, thoughtlessness, or heedlessness — the inadvertent omission of a duty. Likewise, whether the nurse’s reconciliation was simply not performed or was performed incorrectly, there is no evidence indicating that the nurse responsible consciously performed the reconciliation wrongly, or consciously omitted to perform it, “while knowing of the existing conditions and being conscious that from doing or omitting to do an act, injury will likely or probably result.” Fox Alarm Co., supra, — So.2d at -. “ ‘Evidence ... which affords nothing more than mere speculation, or conjecture, or guess is insufficient to warrant the submission of a case to the jury.’ Sprayberry v. First Nat'l Bank, 465 So.2d 1111, 1114 (Ala.1984).” Finley v. Patterson, 705 So.2d 826, 830 (Ala.1997).
As to whether the symptoms Ferguson exhibited should have caused one of the nurses at Baptist to seek to have Ferguson’s Dilantin’s blood level monitored, Dr. Russell testified that although Ferguson was exhibiting lethargy, confusion, and difficulty walking, all of which can be signs of Dilantin toxicity,
“throughout the time he was on the rehab floor, he was episodically sleepy. And he was taking Valium and getting a lot of pain medicine. So I thought throughout the time he was on the rehab floor, that that was the reason he was lethargic. Plus the fact that he had preexisting dementia and had had a fall. So I thought it was a — mainly a problem with preexisting dementia, plus a lot of pain medicine, plus Valium. And I was never suspicious that he’d had Dilantin toxicity.”
Dr. Russell testified that this was his thinking despite the fact that, given the nature of his practice, he saw Dilantin toxicity fairly frequently.. When Dr. Russell was later asked directly by Ferguson’s counsel “should you have suspected Dilan-tin toxicity?” he responded “I think it would have been very difficult. Of course, I saw him, then my partner, Dr. Swillie, saw him. So he had two neurologists in a row seeing him when he was haying these types of problems, and neither one of us thought of it.” Dr. Russell explained that in spite of being sleepy, Ferguson still complained of back pain so he was “getting aggressive pain management while he was on the rehab floor” and the -pain medications were given in amounts sufficient to cause the kind of lethargy, Dr. Russell observed in Ferguson. Dr. Russell offered the following final explanation concerning his thought processes at the time:
“You know, he’d had a lot of pain medicine. He’s thought to be demented. He was taking Valium. He required Risperdal. I thought the pain medicines on top of everything else was the reason for the lethargy. So I thought probably, when he didn’t require the pain medi *94 cines, plus being out of the hospital— because people who are demented do much worse in the hospital. So I thought when those two things happened, when he didn’t have so much pain medicine, maybe less Valium, that he would do better. But, you know, that was not correct as it turned out.”
Rich explained that although Ferguson’s blood could have been checked for Dilantin levels, the attending physicians must order such a test. Rich testified that the doctor decides how much of a particular medication to administer to a patient and that there was nothing about the Dilantin dosage of 300 milligrams 3 times a day that raised a red flag in her mind concerning the accuracy of the order; a dosage of “three hundred milligrams once a day is not set in stone. They may give it in different intervals.” She agreed with Ferguson’s counsel that a normal adult dose would be approximately 375 milligrams a day. Rich was aware that the prescribed dosage of Dilantin can be different, depending on a patient’s needs. She did not see any symptoms in Ferguson that pointed to Dilantin toxicity before he was discharged on June 1, his lethargy being easily attributable to the various drugs, other than Dilantin, that had been prescribed for him. She testified without objection that she never consciously gave Ferguson medication in error and that she was never conscious that the medication he was receiving was too high a dosage; she did nothing in connection with his hospital care that was a conscious disregard of the safety procedures in place at the hospital.
When Czaplicki was asked if he would consider a dosage of 300 milligrams 3 times a day as being “unheard of’ in a hospital setting, he answered “No sir. It’s not a common dose, but I’ve seen it on multiple occasions in different hospitals that I have worked.” He expressed the opinion that that dosage alone would not raise a red flag in the mind of a pharmacist that the dosage might be placing a patient in jeopardy. Dr. Russell testified that there were occasionally people to whom it was necessary to give large amounts of Dilantin, often in the hospital, so that there were times when a prescribed dosage as high as 900 milligrams daily would be appropriate. Dr. Russell testified that a dosage of 900 milligrams daily would be unusual, “[b]ut we have had patients take that amount or higher.” There was no other expert medical testimony offered on that point.
Given the state of the record, we cannot say that clear and convincing evidence was presented that any nurse at the hospital was guilty of wantonness in failing to suspect that Ferguson’s symptoms represented Dilantin toxicity, or that nurse Rich was guilty of wantonness in not suspecting the MAR entry was erroneous because of the unusually high daily dosage of Dilantin being administered to Ferguson. There was no expert testimony adduced to the effect that the standard of care would have required Baptist to institute checks, balances, or safeguards to detect a Dilantin medication error, other than the reconciliation process, and there was no expert medical testimony to the effect that the standard of care would have required a nurse to have checked the Physicians’ Desk Reference or any computer system to verify the dosage reflected on the MAR. Finally, not only was there no expert medical testimony to the effect that one of the nurses at the hospital should have procured a blood test to determine the level of Dilan-tin in Ferguson’s blood, there was affirmative testimony that only a doctor could order such a test.
The burden of proof was on Ferguson to present clear and convincing evidence establishing that some agent, servant, or employee of Baptist had not only breached an applicable medical standard of *95 care, but also that in so doing had been guilty of wantonness, i.e., “the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from the doing or omitting to do [the] act, injury will likely or probably result.” Fox Alarm Co., supra, — So.2d at -. Under the “clear and convincing evidence” standard, a party may present evidence that is insufficient to warrant submission to the jury of a claim of wantonness as a basis for punitive damages (and thereby fail to defeat a motion for a judgment as a matter of law) even though there has not been “a complete absence of proof’ on the issue. Coca-Cola Bottling Co. United, Inc., supra, 622 So.2d at 884 n. 3. “Whether the trial court erred in ruling on a [renewal of the motion for a judgment as a matter of law] is tested by the purely objective standard of whether the party having the burden of proof has produced proof to create an issue requiring resolution by a jury,” although when this Court reviews the ruling on such a motion, “the evidence must be reviewed in the light most favorable to the nonmoving party.” 622 So.2d at 884.
Even viewing the evidence in a light most favorable to Ferguson, we cannot find that he produced clear and convincing evidence of wantonness on the part of the pharmacist who erroneously transcribed the May 25, 1999, Dilantin order onto the MAR; on the part of the nurse who failed to conduct, or who erroneously conducted, the reconciliation between the MAR entry and the physician’s order; or on the part of any of the nurses administering the Dilantin dosages stated on the MAR. Stated another way, Ferguson did not present clear and convincing evidence indicating that any individual consciously did something, or omitted to do something, while knowing of the existing conditions and being conscious that, from doing or omitting to do the act in question, injury would likely or probably result to Ferguson.
As to the pharmacy error, we have carefully considered two cases cited by the parties, Harco Drugs, Inc. v. Holloway, 669 So.2d 878 (Ala.1995), and Cackowski v. Wal-Mart Stores, Inc., 767 So.2d 319 (Ala.2000). Together, they stand for the principle that if a pharmacist is presented with an illegible prescription that he or she misreads, without careful study, to call for a dangerous drug that would be anomalous to the specialty of the prescribing physician, the pharmacist must investigate further. Failure to do so could represent a reckless disregard for the safety of others generally. 669 So.2d at 880, 767 So.2d at 326. Conversely, an inadvertent misreading by a pharmacist of a legible prescription, under circumstances whereby the medication given to the patient, although representing an unusual choice, was not of such “extreme unusualness” as to cause any competent pharmacist “grave concern,” would represent no more than negligence. Cackowski, 767 So.2d at 327.
Based on our foregoing analyses, we conclude that the trial court erred in denying Baptist’s renewed motion for a judgment as a matter of law on the issue of wantonness as a predicate for an award of punitive damages, and that part of the judgment is due to be reversed. Because the award of punitive damages in the general verdict demonstrates that the jury based its decision to award such damages on a finding of wantonness, as opposed to the “different tort concept” of negligence (see, e.g., Fox Alarm Co., supra), the verdict cannot be sustained as to the compensatory-damages award. Moreover, because Baptist specifically moved for a judgment as a matter of law as to the wantonness claim, which was the basis for the punitive-damages award, and the trial judge submitted both the negligence and wantonness claims to the jury, and the jury returned a general verdict, this Court cannot presume that the verdict was returned on *96 the “good count” of negligence. Roush, 723 So.2d at 1257.
Accordingly, in case no. 1022175, Ferguson’s direct appeal, we affirm the trial court’s order granting a new trial as to Ferguson’s negligence claim. While we affirm that ruling on a ground different from the ground cited by the trial court, this Court, subject only to exceptions not applicable in this case, can affirm the judgment of the trial court if that judgment is supported by any valid legal ground. Blackmon v. Brazil, 895 So.2d 900 (Ala.2004). In case no. 1030039, Baptist’s cross-appeal, we reverse the judgment denying Baptist’s motion for a judgment as a matter of law and remand for the entry of an order granting Baptist a judgment as a matter of law as to the claim of wantonness.
1022175 — AFFIRMED.
1030039 — REVERSED AND REMANDED.
NABERS, C.J., and SEE, STUART, and BOLIN, JJ., concur.

. "Po” is an abbreviation for the Latin phrase "per os,” meaning by mouth, orally. Merriam-Webster’s Collegiate Dictionary 956 (11th ed.2003); "QHS” is an acronym for the Latin phrase "quaque hora sonani,” meaning at the hour of sleep, i.e., at bedtime. It apparently is a commonly used blending of two acronyms: "QH,” an acronym for "quaque hora,” meaning every hour and "HS,” an acronym for "hora somni,” meaning at bedtime. See Dorland’s Illustrated Medical Dictionary, Appendix 2, “Selected Abbreviations Used in Medicine” (30th ed.2003).

. Effective October 1, 1995, Rule 50, Ala. R. Civ. P., was amended to rename the “motion for directed verdict” as a “motion for judgment as a matter of law,” and rename the “motion for judgment notwithstanding the verdict [J.N.O.V.]” as a “renewal of the motion for a judgment as a matter of law." See Committee Comments to October 1, 1995, Amendment to Rule 50.