PER CURIAM.
This Court's no-opinion order of affirmance of November 4, 2016, is withdrawn, and the following is substituted therefor.
Timothy Joel Thomas appeals following the denial of his numerous postjudgment motions by the Geneva Circuit Court ("the trial court") challenging a judgment entered by the trial court on a jury verdict in *647 favor of Randell Heard and Donna Heard and Laura Wells, as guardian ad litem and next friend of M.A., a minor.
Facts and Procedural History
This case arises out of an automobile accident that occurred on October 15, 2013, at approximately 5:00 p.m. A vehicle driven by Thomas, in which M.A. was a passenger, collided with a vehicle driven by Randell Heard, in which Donna Heard was a passenger.
Thomas testified that, on the day of the accident, he visited Amber Foster's house between 3:15 p.m. and 3:30 p.m. Foster testified that, after Thomas had been at her house for approximately 20 minutes, Thomas drove two of Foster's children, one of whom was M.A., to a Dollar General discount store.[1] Foster testified that Thomas and her two children returned to her house approximately 30 minutes later. Foster then testified that Thomas again left her house with M.A., approximately 20 minutes later.
Foster testified that she did not notice anything unusual about Thomas while he was at her house. Foster also testified that she did not see Thomas consume any alcohol or prescription medications while he was at her house. Foster further testified that she would not have allowed M.A. to leave with Thomas if Foster had thought that Thomas was intoxicated, impaired, or unable to operate a vehicle.
Thomas testified that, while he was at Foster's house, he took Seroquel, a prescription drug, and drank beer. Thomas also testified that, in addition to his prescription for Seroquel, he had prescriptions for other drugs; Thomas testified that it was possible that he had taken some of those prescription drugs in addition to the Seroquel within 24 hours of the accident. Thomas also testified that he purchased beer-"a tallboy"-while on his errand to the Dollar General discount store. When asked if it was possible that he had purchased more than one beer, Thomas responded, "[a]nything is possible." Thomas further testified that while he was at Foster's house he drank "one tallboy beer" and that he was not sure if he had drunk more than the one beer. Thomas also testified that he "could have" drunk more than one beer. Thomas testified that he "remember[ed] not being impaired when [he] left the driveway" of Foster's house with M.A. When asked whether he was impaired at the time he was driving toward the intersection just before the accident, Thomas replied, "[n]o, sir, not that I know of."
Jack Sewell, a pharmacist at the pharmacy where Thomas filled his prescriptions, testified that some of the prescriptions he filled for Thomas, including Seroquel, cause drowsiness. Sewell testified that drinking alcohol with these prescriptions would "just add[ ] to" that drowsiness effect.
Thomas left Foster's house at approximately 4:40 p.m. with M.A. in his vehicle and drove south on County Road 41. At approximately 5:00 p.m., Thomas was approaching the intersection of County Road 41 and State Highway 167 ("the intersection"), which is where the accident occurred.
*648 There are stop signs on County Road 41 requiring the traffic traveling on County Road 41 to yield to the traffic traveling on State Highway 167; there are no stop signs halting traffic traveling on State Highway 167. Thomas testified that he drove over several "rumble strips"[2] on County Road 41 as he approached the intersection. Thomas drove his vehicle into the intersection without stopping at the stop sign on County Road 41. Thomas's vehicle collided with the vehicle being driven by Randell Heard. Thomas testified:
"[Wells's trial counsel:] Why didn't you see the stop sign?
"[Thomas:] I can't tell you that.
"[Wells's trial counsel:] Why didn't you stop at the stop sign?
"[Thomas:] I can't tell you that.
"[Wells's trial counsel:] Why didn't you see the Heards traveling in their silver car to your right?
"[Thomas:] I can't tell you that."
Elizabeth Mims witnessed the accident. Mims testified that it appeared that Thomas slowed his vehicle before entering the intersection but did not completely stop his vehicle. Mims testified that she witnessed Thomas drive his vehicle into the intersection in front of the Heards' vehicle, which, she said, caused the accident.
After the accident occurred, Mims checked on the occupants of both vehicles. Mims testified that "when [she] got to" Thomas's vehicle she could smell alcohol. Mims later clarified that, although she was certain that the odor of alcohol was coming from Thomas's vehicle, she could not identify the source of the odor of alcohol. Mims also testified that she spoke with another woman at the scene of the accident who also indicated that she smelled alcohol. However, Mims did not indicate where at the scene of the accident this other woman had smelled alcohol; specifically, Mims did not testify that this other woman smelled alcohol emanating from Thomas or his vehicle. Chris Sirois, an emergency medical technician dispatched to the scene, testified that he did not smell alcohol while he was "treating or paying attention to" M.A., who was in the vehicle driven by Thomas.
Thomas, M.A., and the Heards sustained serious injuries as a result of the accident and were transported to medical facilities for emergency care; Thomas was transported to Southeast Alabama Medical Center ("SAMC"). Upon Thomas's arrival at SAMC's emergency room, Danielle Stanridge, a laboratory technician at SAMC, testified that she drew blood from Thomas in order to run a medical analysis of Thomas's blood, which she said was the "common and customary" practice. Stanridge used an alcohol swab to sterilize Thomas's arm before she drew his blood sample.
SAMC conducted a "medical-alcohol test" as part of the analysis performed on Thomas's blood sample. Dr. Jack Kalin, the former chief toxicologist of the Alabama Department of Forensic Sciences and a private consultant in forensic technology certified in forensic technology by the American Board of Forensic Technology, explained that the medical-alcohol test performed by SAMC on Thomas's blood sample tested for the concentration of ethanol in Thomas's blood sample. Jeff Sheppard, who was SAMC's laboratory director at the time of the accident, testified that the presence and amount of alcohol in a patient's blood sample is important information for the treating physician to have *649 in deciding whether to use anesthesia on the patient or to prescribe prescription drugs.
Sheppard testified that the medical-alcohol test conducted on Thomas's blood sample indicated that Thomas's blood sample had a "value" of "68 milligrams per deciliter." Sheppard testified that this was an "abnormal" result, which was explained as follows:
"[Wells's trial counsel:] For example, if I've had a cholesterol test done, it tells me here's the normal range, and if mine is high, it will report back above normal. Is that kind of what this is telling us?
"[Sheppard:] Yes."
Dr. Kalin testified that, based on Thomas's blood sample containing 68 milligrams of alcohol per deciliter, Thomas's blood-alcohol concentration "would have been somewhere between a .05 grams percent and a .06 grams percent." Dr. Kalin testified that, based on Thomas's blood-alcohol concentration of .05% to .06%, he opined that Thomas would have consumed "two to three beers, rather than just one."
Dr. Jimmie Valentine, a consultant in clinical pharmacology and toxicology, who was called as a witness by Thomas, testified that the method used to collect Thomas's blood sample and to test for the presence of alcohol was not performed pursuant to forensic standards. For instance, Dr. Valentine testified that, if a sample of Thomas's blood had been taken for the specific purpose of testing it to determine Thomas's blood-alcohol concentration, an alcohol swab should not have been used to sterilize Thomas's arm before his blood was drawn. Dr. Valentine testified that, when an alcohol swab is used to clean the skin, some of the alcohol could be absorbed into the skin, which could contaminate the blood sample drawn. Dr. Valentine explained that the test conducted by SAMC on Thomas's blood sample to determine the presence of alcohol did not reveal the specific type of alcohol present in Thomas's blood sample. Dr. Valentine explained that the alcohol swab used by Stanridge to sterilize Thomas's arm probably contained isopropyl alcohol, while the beer Thomas drank contained ethanol alcohol. Dr. Valentine further explained that the test run by SAMC on Thomas's blood sample would have detected both kinds of alcohol, among other things, generally; there was no way to tell if Thomas's blood sample had been contaminated with the isopropyl alcohol from the alcohol swab. Dr. Valentine testified that the preferred method "for doing alcohol analysis" is a method called "gas chromatograph." SAMC did not use the gas-chromatograph method in determining that Thomas's blood sample contained 68 milligrams per deciliter. Regardless, accepting that Thomas's blood sample contained 68 milligrams of ethanol per deciliter, Dr. Valentine agreed with Dr. Kalin's assessment of Thomas's blood-alcohol concentration.
Dr. Kalin testified that it is possible for people with a blood-alcohol concentration of less than .08% to be impaired and to have difficulty driving:
"[Heards' trial counsel:] And a blood/alcohol of a .08, you use the word intoxicated, in your area of expertise, can individuals be impaired such as they are unsafe and unfit to drive an automobile at less than a level of .08?
"....
"[Dr. Kalin:] State law provides a presumption that .08 or greater, then you are under the influence of alcohol. However, state law also recognizes the scientific reality that people below .08 can be impaired and have difficulty driving. So, if someone can be demonstrated to be impaired with an ethanol concentration *650 of less than .08, they can be convicted of drunk driving."[3]
Dr. Kalin explained the effects Thomas may have experienced as a result of his blood-alcohol concentration of .05% to .06%:
"[Heards' trial counsel:] ... What effect could you expect to see in Mr. Thomas with the level of blood/alcohol content of .05 to .06 that you've described?
"[Dr. Kalin:] I'm going to answer your question literally-you would see nothing.
"[Heards' trial counsel:] In other words, would someone be able to visually tell if you were intoxicated or impaired?
"[Dr. Kalin:] Quite possibly not.
"[Heards' trial counsel:] Would there be effects to Mr. Thomas at that level?
"[Dr. Kalin:] Yes, there would be.
"[Heards' trial counsel:] And in reaching that opinion, are you trained in that regard in all of your training with the State Of Alabama and your toxicological research?
"[Dr. Kalin:] Yes.
"[Heards' trial counsel:] And is that part of what you have always done for the State Of Alabama?
"[Dr. Kalin:] Yes.
"[Heards' trial counsel:] Can you tell us what those affects would be?
"[Dr. Kalin:] The .05 to .06 you would expect the person's inhibitions to be inhibited. Ethanol is a central nervous system depressant, which means it turns things off. The first thing it turns off is your higher mental functions and that's the little voice in the back of your head that tells you to behave. That's why a couple of drinks at a party make you talk, maybe you shouldn't say what you're saying, but nonetheless you do. That's a little bit of a buzz, you feel a little bit of euphoria, you may be at the greater risk-well, more prone to risky activity. You would be surprised over how many people get in fights over these levels of alcohol because their inhibitions are inhibited. You're going to have some fine motor skill problems, how many things can you juggle at one time. You may do okay, but you're certainly not going to do as well as you would otherwise without the ethanol. Your judgment is going to be a problem in what you see, what you perceive, what you think, what you know. That's all impaired even by low levels of ethanol. That's what the buzz is, the buzz is something that makes you care less about your circumstances than you probably otherwise should.
"You may experience some visual acuity problems, you may have difficulty focusing and you may not see very-as well as you would otherwise, or you may see well enough, but one of the things that you do lose is your peripheral vision, *651 where people can't see what's coming on the sides. I'm sorry I'm holding up my hand in front of the Court Reporter, but that's a demonstration of what peripheral vision is. I can see something out the side of my head, I don't have to turn left or right to see traffic coming. This is a common problem that some people experience with low levels of alcohol, the loss of that capability, you just don't see it, you never see it coming.
"So, you're not going to have a problem typically with your speech, other than you're probably going to use much more of it than you should.
"You're not going to have problems with your balance. You can probably stand up and move around and not have much of a problem, but that doesn't mean that you will have all your faculties sufficiently to do complicated tasks."
However, Dr. Kalin also testified that, although everyone experiences the same effects of alcohol, not everyone experiences them at the same blood-alcohol concentration. (R. 203.) For instance, Dr. Kalin testified:
"[Thomas's trial counsel:] And that was the purpose in asking that because although you describe that there may be visual acuity, there may be peripheral vision impacted, there may be judgment impacted with this level of blood/alcohol concentration that you say existed, does not mean that Mr. Thomas was experiencing those things, does it?
"[Dr. Kalin:] That's correct."
On November 29, 2013, Wells, "in her capacity as guardian ad litem and next friend" of M.A., sued Thomas, among others, asserting claims of negligence and wantonness. On January 24, 2014, in a separate action, the Heards sued Thomas, among others, asserting claims of negligence and wantonness.[4] Thomas answered both complaints. The trial court consolidated the two actions for purposes of discovery and trial.
On August 11, 2015, Thomas filed a motion to "strike, dismiss, and/or remove" Wells as the "representative" of M.A. Thomas noted that the Houston Juvenile Court had appointed Wells as M.A.'s "juvenile attorney" on June 26, 2012. However, Thomas argued that, pursuant to § 6-5-390, Ala. Code 1975, Wells had no legal authority to file the underlying action against Thomas. Section 6-5-390 states:
"A father or a mother, provided they are lawfully living together as husband and wife, shall have an equal right to commence an action for an injury to their minor child, a member of the family; provided, however, that in the event such mother and father are not lawfully living together as husband and wife, or in the event legal custody of such minor child has been lawfully vested in either of the parties or some third party, then and in either event the party having legal custody of such minor child shall have the exclusive right to commence such action."
On August 13, 2015, Wells filed a response, arguing that the underlying action "was properly commenced in the name of the guardian ad litem for the benefit of" M.A. The trial court did not rule on Thomas's motion. Instead, on August 21, 2015, the trial court entered an order appointing *652 Wells as guardian ad litem and next of friend of M.A.
Trial began on August 24, 2015. At the close of the Heards' and Wells's cases, Thomas filed a motion for a judgment as a matter of law ("JML"). Generally, Thomas alleged that the Heards and Wells had failed to present sufficient evidence to support their negligence and wantonness claims. The trial court denied Thomas's motion for a JML. At the close of all the evidence, Thomas again filed a motion for a JML, raising the same issues he had raised in his initial motion. The trial court denied Thomas's second JML motion, and the case was submitted to the jury.
On August 28, 2015, the jury returned a verdict against Thomas and in favor of the Heards, upon which the trial court entered the following judgment:
"Case tried to a jury and the jury returned the following verdict:
" 'We, the jury, find for the plaintiffs and against the defendant and assess plaintiffs' damages as follows:
" 'Randell Heard
" 'Compensatory: Eight hundred fifty thousand dollars ($850,000).
" 'Punitive: Seven hundred fifty thousand dollars ($750,000).
" 'Donna Heard
" 'Compensatory: Four hundred fifty thousand dollars ($450,000).
" 'Punitive: Seven hundred fifty thousand dollars ($750,000).'
"The Court enters the judgment in accordance with the jury's verdict."
The jury also returned a verdict in favor of Wells, upon which the trial court entered its judgment, as follows:
"Case tried to a jury and the jury returned the following verdict:
" 'We, the jury, find for the plaintiff and against the defendant and assess plaintiff's damages as follows:
" '[M.A. ]
" 'Compensatory: Five hundred thousand dollars ($500,000).
" 'Punitive: Five hundred thousand dollars ($500,000).'
"The Court enters the judgment in accordance with the jury's verdict."
On September 11, 2015, the Heards filed a "motion for costs" requesting costs in the amount of $21,140.30. On September 15, 2015, Wells also filed a "motion to tax costs" requesting costs in the amount of $17,221.54. Each motion was supported with extensive documentary evidence.
On September 25, 2015, Thomas filed a motion to alter, amend or vacate the trial court's August 28, 2015, judgments. Thomas argued, among other things, that the "jury's award of damages based on wantonness was against the great weight of the evidence" and that the "jury's award of punitive damages was not supported by clear and convincing evidence." Thomas also argued that, under § 6-5-390, "Wells was not entitled to make any claim on behalf of [M.A.]."
Also on September 25, 2015, Thomas filed a renewed motion for a JML. As he did in his first two JML motions, Thomas argued that the Heards and Wells had failed to present sufficient evidence to support their negligence and wantonness claims and that they had failed to present sufficient evidence to support the jury's award of punitive damages. Thomas also argued that, pursuant to § 6-5-390, "Wells is not allowed under Alabama law to pursue damages for [M.A.]."
Also on September 25, 2015, Thomas filed a motion for a remittitur, which he amended on October 9, 2015.
*653 On October 19, 2015, following a hearing, the trial court denied Thomas's postjudgment motions and granted the motions for costs filed by the Heards and Wells. Thomas separately appealed as to the Heards and Wells. We have consolidated the two appeals for the purpose of writing one opinion.
Standard of Review
In Cheshire v. Putman, 54 So.3d 336, 340 (Ala. 2010), this Court set forth the following standard of review applicable to our review of a ruling on a motion for a JML:
"In American National Fire Insurance Co. v. Hughes, 624 So.2d 1362 (Ala. 1993), this Court set out the standard that applies to the appellate review of a trial court's ruling on a motion for a JML:
" 'The standard of review applicable to a ruling on a motion for JNOV [now referred to as a renewed motion for a JML] is identical to the standard used by the trial court in granting or denying a motion for directed verdict [now referred to as a motion for a JML]. Thus, in reviewing the trial court's ruling on the motion, we review the evidence in a light most favorable to the nonmovant, and we determine whether the party with the burden of proof has produced sufficient evidence to require a jury determination.'
" 624 So.2d at 1366 (citations omitted). Further, in Cessna Aircraft Co. v. Trzcinski, 682 So.2d 17 (Ala. 1996), this Court held:
" 'The motion for a J.N.O.V. [now referred to as a renewed motion for a JML] is a procedural device used to challenge the sufficiency of the evidence to support the jury's verdict. See, Rule 50(b), [Ala.] R. Civ. P.; Luker v. City of Brantley, 520 So.2d 517 (Ala. 1987). Ordinarily, the denial of a directed verdict [now referred to as a JML] or a J.N.O.V. is proper where the nonmoving party has produced substantial evidence to support each element of his claim. However, if punitive damages are at issue in a motion for a directed verdict or a J.N.O.V., then the "clear and convincing" standard applies. Senn v. Alabama Gas Corp., 619 So.2d 1320 (Ala. 1993).'
" 682 So.2d at 19 (footnote omitted). '[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co., 547 So.2d 870, 871 (Ala. 1989). See § 12-21-12(d), Ala. Code 1975."
In Classroomdirect.com, LLC v. Draphix, LLC, 992 So.2d 692, 710 (Ala. 2008), this Court set forth the following standard of review concerning the taxation of costs under Rule 54(d), Ala. R. Civ. P.:
"[T]his Court's caselaw is well settled that the taxation of costs is discretionary with the trial court. See, e.g., Smith v. Smith, 482 So.2d 1172, 1175 (Ala. 1985) ('The taxation of costs pursuant to [ Rule 54(d), Ala. R. Civ. P.,] is generally left to the sound discretion of the trial judge.'); Vulcan Oil Co. v. Gorman, 434 So.2d 760, 762 (Ala. 1983) ('[T]he taxation of costs ... rests in the discretion of the trial judge, whose decision will not be reversed unless clear abuse is shown.')."
Discussion
Initially, we must consider Thomas's argument that Wells is not the appropriate party under § 6-5-390 to commence the underlying action in case no. 1150119 on behalf of M.A. Thomas directs *654 this Court's attention to the following language in § 6-5-390 : "[T]he party having legal custody of [the] minor child shall have the exclusive right to commence such action." Thomas argues that because Wells did not have legal custody of M.A., she did not have the authority to commence the underlying action against Thomas.
Thomas's argument, however, ignores the purpose of § 6-5-390, which appears to have no application in the present case. Section 6-5-390, or a predecessor, has been in effect since 1852. In 1893, this Court stated the following in McNamara v. Logan, 100 Ala. 187, 14 So. 175 (1893), regarding the purpose of what is now codified as § 6-5-390 :
"It merely secures to the father, and, in certain contingencies, the mother, the right to sue for injuries to a minor child, a member of the family, and in such suit to recover the damages which they themselves-the father or mother, as the case may be-have sustained through the injury of a child, whose minority so long, and only so long as it continued entitled them to his services and involved reciprocal obligations of care and support. But it is not provided, and it was clearly not the intention of the codifiers or the legislature which adopted the Code to provide, that the recovery of these, in a sense, special damages by the parent should deprive the minor of his own right of compensation for the injuries he had received and which in no case could be taken into the account in assessing the damages sustained by the parent.... And where the wrong and injury is to a minor, and is not fatal ...: suits may be maintained both by the parent and the child. Pratt Coal & Iron Co. v. Brawley, 83 Ala. 371, 3 So. 555 [ (1888) ] ; South & North Alabama Railroad Co. v. Donovan, 84 Ala. 141, 4 So. 142 [ (1888) ]."
100 Ala. at 195-96, 14 So. at 177. More recently, in Thorne v. Odom, 349 So.2d 1126, 1129 (Ala. 1977), this Court stated concerning the purpose of what is now codified as § 6-5-390 : "The object of [what is now codified as § 6-5-390 ] is to provide a right of action for the parent's damages for loss of services, expense of treatment, etc. for the child's injury." Further, this principle is summarized in Alabama Law of Damages, as follows: "The parent's action for loss of services is separate and distinct from an action by the child for his personal injury, pain, suffering, and diminution of earning capacity after attainment of majority." Jenelle Mims Marsh, Alabama Law of Damages § 20:4 (6th ed. 2012) (citing Propst v. Georgia Pac. Ry., 83 Ala. 518, 3 So. 764 (1888), and McNamara, supra). This principle is also stated in 67A C.J.S. Parent and Child § 350 (2013) :
"When a person negligently injures a minor, two separate causes of action arise: the minor child has a cause of action for injuries suffered by it, and the parent or parents of the minor child have a cause of action for the loss of services and for medical expenses incurred by the parent for the treatment of the minor's injuries, and in the absence of any waiver or estoppel, the damages peculiar to one of these causes of action may not properly be recovered in an action based on the other.
"That is, in a case of an injury to an unemancipated infant by a wrongful act, two causes of action ordinarily arise; one cause of action is on behalf of the infant to recover damages for pain and suffering, permanent injury, and impairment of earning capacity after attaining majority, and the other is on behalf of the parent for loss of services during minority and necessary expenses incurred for the infant's treatment. The *655 objective of the common-law rule that an injury to a child gave rise to two causes of action, one on behalf of the child and one on behalf of the parents, was to allow a party who actually suffered damages to recover the loss from the tortfeasor and to prevent double recoveries."
(Footnotes omitted.) It is well settled that M.A.'s cause of action for her injuries is separate and distinct from any cause of action M.A.'s legal guardian would bring under § 6-5-390.
As Wells argues in her brief before this Court, M.A.'s action against Thomas seeks recovery of damages for injuries M.A. incurred as a result of Thomas's actions. M.A. has not filed an action under § 6-5-390 seeking reimbursement on behalf of her legal guardians. In fact, M.A. has no personal action under § 6-5-390 ; only her legal guardian would have such a cause of action. Instead, M.A. sued Thomas through Wells, her guardian ad litem and next friend. Alabama Law of Damages § 11:16 states:
"A minor has no capacity as a plaintiff in an action or special proceeding except through a general guardian or like fiduciary. If an infant does not have such a general guardian or like fiduciary, the Alabama Rules of Civil Procedure provide that the minor may sue by his next friend or a court-appointed guardian ad litem.[1] Whenever a person sues as the next friend of a minor, the minor is the real party to the suit, and recovery belongs to him because his rights are those litigated.[2]
"____________________
"[1] Ala. R. Civ. P. 17(c) (applying also to incompetent persons); Citizens Walgreen Drug Agency, Inc. v. Gulf Ins. Co., 282 Ala. 648, 213 So.2d 814 (1968) ; Pate v. Perry's Pride, Inc., 348 So.2d 1038 (Ala. 1977). See also Flippo v. Pope, 834 So.2d 83, 87 (Ala. 2002) (an action commenced by a next friend on behalf of a minor does not abate when the minor reaches the age of majority even though the authority of the next friend expires if the former minor elects to proceed).
"[2] Maples v. Chinese Palace, Inc., 389 So.2d 120 (Ala. 1980)."
Thomas's argument is without merit. Wells, as M.A.'s guardian ad litem and next friend, properly filed M.A.'s action against Thomas.
Next, Thomas argues that the trial court erred in denying his motions for a JML concerning the Heards' and Wells's wantonness claims against him because, Thomas argues, the Heards and Wells failed to present substantial evidence that Thomas acted wantonly.[5] In Joyner v. B & P Pest Control, Inc., 853 So.2d 991, 999 (Ala. Civ. App. 2002), the Court of Civil Appeals stated: "A JML is appropriate on a wantonness claim if the plaintiff has failed to offer substantial evidence showing that the defendant knew that its act or omission would likely or probably result in injury. See Anderson v. Moore Coal Co., 567 So.2d 1314, 1317 (Ala. 1990)." "Substantial evidence" is defined as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). This Court defined wantonness in Ex parte Essary, 992 So.2d 5, 9-10 (Ala. 2007), as follows:
" 'Wantonness has been defined by this Court as the conscious doing of some act or the omission of some duty while knowing of the existing conditions *656 and being conscious that, from doing or omitting to do an act, injury will likely or probably result. Bozeman v. Central Bank of the South, 646 So.2d 601 (Ala. 1994). To constitute wantonness, it is not necessary that the actor know that a person is within the zone made dangerous by his conduct; it is enough that he knows that a strong possibility exists that others may rightfully come within that zone. Joseph v. Staggs, 519 So.2d 952, 954 (Ala. 1988). Also, it is not essential that the actor should have entertained a specific design or intent to injure the plaintiff, only that the actor is 'conscious' that injury will likely or probably result from his actions. Id.'Conscious' has been defined as ' "perceiving, apprehending, or noticing with a degree of controlled thought or observation: capable of or marked by thought, will, design, or perception" '; ' "having an awareness of one's own existence, sensations, and thoughts, and of one's environment; capable of complex response to environment; deliberate." ' Berry v. Fife, 590 So.2d 884, 885 (Ala. 1991) (quoting Webster's New Collegiate Dictionary 239 (1981) and The American Heritage Dictionary of the English Language 283 (1969), respectively).
"Additionally, when determining if a defendant's actions constitute wanton conduct, it is important for the court to distinguish between wantonness and negligence.
" ' " 'Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury....
" ' " 'Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as ... a conscious ... act. "Simple negligence is the inadvertent omission of duty; and wanton or willful misconduct is characterized as such by the state of mind with which the act or omission is done or omitted." McNeil v. Munson S.S. Lines, 184 Ala. 420, [423], 63 So. 992 (1913)....' " '
" Tolbert v. Tolbert, 903 So.2d 103, 114-15 (Ala. 2004) (quoting Ex parte Anderson, 682 So.2d 467, 470 (Ala. 1996), quoting in turn Lynn Strickland Sales & Serv., Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142, 145-46 (Ala. 1987) ) (emphasis added)."
This Court further stated in Ex parte Essary that "[t]he determination whether a defendant's acts constitute wanton conduct depends on the facts in each particular case. Ex parte Anderson, 682 So.2d [467,] 470 [ (Ala. 1996) ]." 992 So.2d at 10. In the present case, it is undisputed that Thomas drove his vehicle into the intersection without coming to a complete stop at the stop sign regulating traffic traveling south on County Road 41. The evidence indicates that Thomas slowed his vehicle as he approached the intersection but that he did not bring his vehicle to a complete stop before he drove into the intersection, where the collision occurred. There is no evidence indicating that Thomas was driving his vehicle at an unsafe speed. There is evidence indicating that Thomas drank at least one "tallboy" beer and that he took a Seroquel pill before leaving Foster's house. There was testimony presented that Seroquel causes drowsiness and that that effect would be exacerbated by alcohol. There was also evidence presented indicating that Thomas drank more than one *657 beer. In fact, the evidence indicates that Thomas's blood-alcohol concentration "would have been somewhere between a .05 grams percent and a .06 grams percent." The evidence also indicates that witnesses smelled alcohol in the area of Thomas's vehicle immediately after the accident. Dr. Kalin testified as to the effects a person with a blood-alcohol concentration of .05% to .06% may experience. Dr. Kalin testified that a person with a blood-alcohol concentration of .05% to .06% may be "more prone to risky activity"; may have "some fine motor skill problems, how many things can you juggle at one time"; and "may experience some visual acuity problems," including potential loss of peripheral vision. However, Dr. Kalin testified that there was no evidence indicating that Thomas was actually experiencing these effects. Further, Thomas explicitly testified that he was not impaired when he left Foster's house.
Viewing these facts in a light most favorable to the Heards and Wells, as we must, there is substantial evidence that Thomas drove his vehicle into the intersection without stopping at the stop sign regulating traffic on County Road 41, and that his driving so caused the accident. There is substantial evidence that Thomas drove his vehicle while he had a blood-alcohol concentration of .05% to .06%. There is also substantial evidence from which the jury could infer that, while Thomas was driving his vehicle with a blood-alcohol concentration of .05% to .06%, Thomas was experiencing the above-mentioned effects testified to by Dr. Kalin.
Thomas argues that, based on this Court's decision in Ex parte Essary, these facts are not substantial evidence of wantonness. In Ex parte Essary, Essary failed to completely stop at a stop sign before he drove his vehicle into an intersection, thereby causing an accident. Essary's vehicle collided with another vehicle, causing serious injuries to the occupants of the other vehicle. The facts indicated that Essary had come to a "rolling stop" and had tried to "shoot the gap" between two vehicles. The occupants of the vehicle Essary's vehicle collided with sued Essary, alleging negligence and wantonness. Essary filed a motion for a JML as to the wantonness claim. The trial court granted Essary's JML motion, but the Court of Civil Appeals reversed the trial court's judgment. On appeal, this Court reversed the Court of Civil Appeals' decision, stating:
"Although the evidence indicates that Essary knowingly entered the intersection, there is nothing from which the trier of fact could infer that, in moving his vehicle through the intersection, Essary's state of mind contained the requisite consciousness, awareness, or perception that injury was likely to, or would probably, result. Indeed, the risk of injury to Essary himself was as real as any risk of injury to the plaintiffs. Absent some evidence of impaired judgment, such as from the consumption of alcohol, we do not expect an individual to engage in self-destructive behavior. See Griffin Lumber Co. v. Harper, 252 Ala. 93, 95, 39 So.2d 399, 401 (1949) ('There is a rebuttable presumption recognized by the law that every person in possession of his normal faculties in a situation known to be dangerous to himself, will give heed to instincts of safety and self-preservation to exercise ordinary care for his own personal protection. It is founded on a law of nature and has [as] its motive the fear of pain or death. Atlantic Coast Line R. Co. v. Wetherington, 245 Ala. 313(9), 16 So.2d 720 [ (1944) ].').
"The facts here presented do not establish any basis from which to conclude that Essary was not possessed of his normal faculties, such as from voluntary *658 intoxication, rendering him indifferent to the risk of injury to himself when crossing the intersection if he collided with another vehicle. Nor is the act as described by [the plaintiff] so inherently reckless that we might otherwise impute to Essary a depravity consistent with disregard of instincts of safety and self-preservation. We therefore conclude that, as a matter of law, the plaintiffs failed to offer substantial evidence indicating that Essary was conscious that injury would likely or probably result from his actions."
Ex parte Essary, 992 So.2d at 12.
This Court concluded in Ex parte Essary that, based on the facts of that case, a motorist who failed to come to a complete stop at a stop sign and who drove his vehicle into an intersection with knowledge that a car was approaching, which resulted in an accident, was not guilty of wantonness. This conclusion was based on the rebuttable presumption that, unless their judgment is impaired, humans will act in their own self-interest. In other words, the Court in Ex parte Essary assumed that the motorist who caused the accident had no consciousness that an injury would likely occur from his actions because presumably he would not engage in activity that would knowingly result in harm to himself. However, this Court did indicate that that presumption could be rebutted if there were substantial evidence that the motorist was not in possession of his "normal faculties" as a result of "voluntary intoxication" such that he was indifferent to the risk of injury to himself.
The present case raises the same issue. Unlike the motorist in Ex parte Essary, however, Thomas voluntarily consumed alcohol and at least one prescription drug before causing the accident. Dr. Kalin testified to the following effect, among others, that Thomas was potentially experiencing as a result of his voluntary consumption of alcohol:
"Your judgment is going to be a problem in what you see, what you perceive, what you think, what you know. That's all impaired even by low levels of ethanol. That's what the buzz is, the buzz is something that makes you care less about your circumstances than you probably otherwise should."
This constitutes substantial evidence from which a jury could infer that Thomas was not in possession of his "normal faculties" as a result of voluntary intoxication such that he was indifferent to the risk of injury to himself. Or, as alternatively stated by this Court in Roberts v. Brown, 384 So.2d 1047, 1051 (Ala. 1980), Thomas "voluntarily created the conditions which led to the accident" by his consumption of alcohol. Accordingly, we do not find convincing Thomas's argument that the Heards and Wells failed to present substantial evidence of wantonness; there was substantial evidence from which the jury could have reasonably inferred that Thomas was not in possession of his normal faculties at the time of the accident as the result of his voluntary consumption of alcohol and at least one prescription drug.
Thomas argues that, based on the evidence presented, a judgment in favor of the Heards and Wells on their wantonness claims requires "the impermissible stacking of multiple inferences to imply that Thomas was impaired." Thomas's brief, at p. 33. We disagree. There was direct evidence that Thomas's blood-alcohol concentration was .05% to .06% shortly following the accident.[6] There was direct evidence *659 that a person with .05% to .06% blood-alcohol concentration may experience the effects Dr. Kalin testified to. The only inference the jury needed to make was that Thomas was actually experiencing those effects at the time of the accident. The jury's inference that Thomas was experiencing those effects is reasonable, given the substantial evidence presented by the Heards and Wells. Thomas's argument is not persuasive.
Next, Thomas argues that the Heards and Wells "failed to present clear and convincing evidence of wantonness so as to support submission of punitive damages to the jury." Thomas's brief, at p. 40. In Cessna Aircraft Co. v. Trzcinski, 682 So.2d 17, 19-20 (Ala. 1996), this Court discussed the following pertinent principles:
"The [renewed] motion for a [JML] is a procedural device used to challenge the sufficiency of the evidence to support the jury's verdict. See, Rule 50(b), [Ala.] R. Civ. P.; Luker v. City of Brantley, 520 So.2d 517 (Ala. 1987). Ordinarily, the denial of a [motion for a JML] or a [renewed motion for a JML] is proper where the nonmoving party has produced substantial evidence to support each element of his claim. However, if punitive damages are at issue in a motion for a [JML] or a [renewed motion for a JML], then the 'clear and convincing' standard applies. Senn v. Alabama Gas Corp., 619 So.2d 1320 (Ala. 1993).
" Section 6-11-20(a), Ala. Code 1975, provides that punitive damages may be awarded in tort actions 'where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in ... wantonness' that caused injury to the plaintiff. 'Clear and convincing evidence' is defined in the Code:
" 'Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.'
" Ala. Code 1975, § 6-11-20(b)(4).
"Thus, the 'clear and convincing' standard requires the trial judge to do more than merely determine whether the nonmoving party has presented substantial evidence to support the claim for punitive damages. It is not the trial judge's function when ruling on a [motion for a JML] or [renewed motion for a JML] to weigh the evidence; rather, he must view the evidence in a light most favorable to the nonmoving party. If in viewing the evidence in that light the judge reasonably can conclude that a jury could find the facts in favor of the nonmovant and that the jury could be firmly convinced of that decision after considering the evidence in opposition, then the judge should deny the motion."
(Footnote omitted.)
As made clear by the facts presented in Ex parte Essary, Thomas's failure *660 to bring his vehicle to a complete stop at the stop sign regulating traffic on County Road 41 before driving his vehicle into the intersection and causing the accident is not, in and of itself, substantial evidence of wantonness. This is so, the Court in Ex parte Essary made clear, because there is a presumption that a person will not consciously do something that will cause himself harm. However, the self-preservation presumption may be rebutted by, among other things, evidence indicating that the actor did not have possession of his or her normal faculties such that he or she did not appreciate the danger the actor's actions posed to himself or herself. We have determined that the Heards and Wells presented substantial evidence sufficient to rebut the self-preservation presumption. We must now determine if the Heards and Wells have presented clear and convincing evidence rebutting the self-preservation presumption.
As set forth above, the Heards and Wells had to present:
"Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
§ 6-11-20(b)(4), Ala. Code 1975.
The Heards and Wells presented clear and convincing evidence of Thomas's voluntary intoxication sufficient to rebut the self-preservation presumption. The evidence indicates that Thomas consumed alcohol and at least one prescription drug before driving his vehicle away from Foster's house. As Thomas approached the stop sign, he slowed the vehicle he was driving and then, without coming to a complete stop, drove his vehicle into the intersection; this is clear and convincing evidence that Thomas was aware of the presence of the stop sign and that he consciously chose to disregard it. From Thomas's equivocal testimony as to how much he drank, the jury could have concluded that he drank more than one beer. There is clear and convincing evidence to support such a conclusion given that Thomas's blood-alcohol concentration was between .05% and .06% at the time of the accident. Testimony was unequivocal that several of the drugs Thomas could have possibly taken, including Seroquel, which he did take, cause drowsiness and that alcohol would exacerbate that effect.
Dr. Kalin testified that it is possible for people with Thomas's blood-alcohol concentration to be impaired; that one "would expect" their "inhibitions to be inhibited"; that they would be "more prone to risky activity"; that they would have "some fine motor skill problems"; that their "judgment is going to be a problem in what [they] see, what [they] perceive, what [they] think, [and] what [they] know. That's all impaired even by low levels of ethanol." Additionally, a person with Thomas's blood-alcohol concentration "may experience some visual acuity problems," may "have difficulty focusing," "may not see ... as well as [he] would otherwise," and will lose peripheral vision.
Dr. Kalin did testify that not everyone experiences the same effects at the same blood-alcohol concentration. Further, he did discuss the impact of the alcohol on Thomas in terms of what "may" occur. However, if there is any lingering doubt as to whether there was clear and convincing evidence to rebut the self-preservation presumption, Thomas's own testimony indicated that he was impaired:
*661 "[Wells's trial counsel:] Why didn't you see the stop sign?
"[Thomas:] I can't tell you that.
"[Wells's trial counsel:] Why didn't you stop at the stop sign?
"[Thomas:] I can't tell you that.
"[Wells's trial counsel:] Why didn't you see the Heards traveling in their silver car to your right?
"[Thomas:] I can't tell you that."
The above-summarized evidence in conjunction with Thomas's own testimony constitutes clear and convincing evidence from which a jury could derive a firm conviction that Thomas was not in possession of his "normal faculties" as a result of voluntary intoxication so that he was indifferent to the risk of injury to himself. Accordingly, Thomas's argument that the Heards and Wells failed to present clear and convincing evidence of wantonness is not convincing.
Next, Thomas argues that, even if this Court determines that the Heards and Wells presented clear and convincing evidence sufficient to support an award of punitive damages on their wantonness claims, the jury's punitive-damages awards were excessive. Thomas first notes that, in denying his motion for a remittitur, the trial court simply stated: "Defendant's Motion for Remittitur is denied." Thomas argues that the trial court's cursory denial of his motion for a remittitur is in violation of Alabama law because the trial court did not include a written statement of the reasons for that denial. In making this argument, Thomas relies on the following portion of Williford v. Emerton, 935 So.2d 1150, 1156 (Ala. 2004) :
"As we explained in Love v. Johnson, 775 So.2d 127, 127-28 (Ala. 2000), such a written statement is necessary before this Court can conduct a proper review on appeal:
" 'In Hammond [v. City of Gadsden, 493 So.2d 1374 (Ala. 1986) ], this Court required that a trial court "reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on the grounds of excessiveness of the damages." 493 So.2d at 1379 ; see also ALFA Mut. Ins. Co. v. Brewton, 554 So.2d 953 (Ala. 1989). In Hammond, this Court stated the reason for the requirement:
" ' "[T]he trial judge is better positioned to decide whether the verdict is ... flawed [as excessive]. He has the advantage of observing all of the parties to the trial-plaintiff and defendant and their respective attorneys, as well as the jury and its reaction to all of the others. There are many facets of a trial that can never be captured in a record, so that the appellate courts are at a special disadvantage when they are called upon to review [a] trial [court's] action in this sensitive area...."
" ' 493 So.2d at 1378-79.'
"When a trial court fails to put in writing its reasons for denying a motion to review a punitive-damages award for excessiveness, this Court's practice has been to remand the cause for the trial court to enter an order in compliance with Hammond. See, e.g., Love, 775 So.2d at 128 ; Spencer v. Lawson, 815 So.2d 502 (Ala. 2001) ; Southern Pine Elec. Coop. v. Burch, 878 So.2d 1120 (Ala. 2003)."
Thomas is correct. The trial court failed to put into writing its reasons for denying Thomas's motion for a remittitur of the punitive-damages awards. Therefore, we remand this case to the trial court for the entry of an order that complies with the requirements of Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986).
*662 Lastly, Thomas argues that the trial court "erred by awarding all of the costs claimed by" the Heards and Wells. Thomas's brief, at p. 56. Thomas does not argue that the Heards and Wells failed to present evidence supporting their motions for costs. Rather, Thomas's argument is limited to arguing that the trial court had no authority to award certain kinds of costs it awarded to the Heards and Wells.
The awarding of costs by a trial court is governed by Rule 54(d), Ala. R. Civ. P., which states, in pertinent part: "Except when express provision therefor is made in a statute, costs shall be allowed as of course to the prevailing party unless the court otherwise directs ...." In Bundrick v. McAllister, 882 So.2d 864, 866 (Ala. Civ. App. 2003), this Court stated: "[O]ur review of a trial court's order taxing costs pursuant to Rule 54(d) is limited to determining whether 'a clear abuse of discretion' is present. Garrett[ v. Whatley], 694 So.2d [1390,] 1391 [ (Ala. Civ. App. 1997) ]."
Thomas first argues that the trial court erred in awarding the Heards and Wells "medical expert witness fees." Thomas's brief, at p. 58. Thomas correctly notes that Bundrick stands for the proposition " 'that compensation of experts cannot be allowed and taxed against the parties as costs in litigation unless so provided by statute.' " 882 So.2d at 867 (quoting Hartley v. Alabama Nat'l Bank of Montgomery, 247 Ala. 651, 656, 25 So.2d 680, 683 (1946) ). However, Thomas has not set forth any facts in his brief before this Court indicating that the Heards or Wells were reimbursed for compensation they paid to experts. Thomas asserts that the Heards "recovered $4,200.00 in costs for medical depositions." Thomas's brief, at p. 58. Thomas does not allege that the Heards sought reimbursement for compensation they had paid to experts, only that they recovered costs for "medical depositions." It is well established that,
"under Ala. Code 1975, § 12-21-144,[7] as interpreted by our Supreme Court in Ex parte Strickland, 401 So.2d 33 (Ala. 1981), a trial court may, in its discretion, tax all of the costs of any deposition taken in a case, regardless of whether the deposition was used at trial, if the deposition was reasonably necessary."
Bundrick, 882 So.2d at 866. Therefore, Thomas's argument concerning the Heards' recovery of costs for "medical depositions" is not convincing. Based on the above-quoted language from Bundrick, Thomas's arguments concerning the "deposition fees" recovered by the Heards and Wells are likewise unconvincing. See Thomas's brief, at pp. 61-62.
Concerning Wells, Thomas asserts that "Wells recovered $1,950.00 associated with payments for deposition testimony of medical experts." Thomas's brief, at p. 58. However, Thomas has not directed this Court's attention to any portion of the voluminous record in this case so indicating. Rule 28(a)(10), Ala. R. App. P., requires a party to provide "citations to the ... parts of the record relied on," which Thomas has failed to do. Accordingly, we decline to consider Thomas's argument.
Thomas also raises other arguments concerning costs awarded to the Heards and Wells pertaining to travel, investigation, *663 "audio/visual during trial," and "trial exhibits and copying costs." However, Thomas's arguments concerning those costs are either not supported with binding precedent or not supported with any authority whatsoever.
" Rule 28(a)(10), Ala. R. App. P., requires that arguments in an appellant's brief contain 'citations to the cases, statutes, other authorities, and parts of the record relied on.' Further, 'it is well settled that a failure to comply with the requirements of Rule 28(a)(10) requiring citation of authority in support of the arguments presented provides this Court with a basis for disregarding those arguments.' State Farm Mut. Auto. Ins. Co. v. Motley, 909 So.2d 806, 822 (Ala. 2005) (citing Ex parte Showers, 812 So.2d 277, 281 (Ala. 2001) ). This is so, because ' "it is not the function of this Court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument." ' Butler v. Town of Argo, 871 So.2d 1, 20 (Ala. 2003) (quoting Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala. 1994) )."
Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So.2d 1, 9 (Ala. 2007). Accordingly, we will not consider Thomas's unsupported arguments.
Conclusion
Based on the foregoing, we conclude that the trial court correctly denied Thomas's renewed motion for a JML, and we affirm the trial court's judgments on the Heards' and Wells's wantonness claims. We also affirm the trial court's award of costs to the Heards and Wells. However, we remand the cause for the trial court to take such steps as are necessary to enter an order in compliance with Hammond on the punitive-damages awards. The trial court shall make a return to this Court within 90 days from the date this opinion is released. On return to remand, Thomas can renew his argument to this Court, if he so desires, that the punitive-damages awards are excessive.
1150118-APPLICATION GRANTED; NO-OPINION ORDER OF AFFIRMANCE OF NOVEMBER 4, 2016, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; AND REMANDED WITH INSTRUCTIONS.
Parker, Main, and Wise, JJ., concur.
Bryan, J., concurs in part and concurs in the result.
Shaw, J., concurs in the result.
Stuart, Bolin, and Murdock, JJ., dissent.
1150119-APPLICATION GRANTED; NO-OPINION ORDER OF AFFIRMANCE OF NOVEMBER 4, 2016, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; AND REMANDED WITH INSTRUCTIONS.
Parker, Main, and Wise, JJ., concur.
Bryan, J., concurs in part and concurs in the result.
Shaw, J., concurs in the result.
Murdock, J., concurs in the result in part and dissents in part.
Stuart and Bolin, JJ., dissent.
BRYAN, Justice (concurring in part and concurring in the result).
Regarding the discussion in the main opinion affirming the trial court's judgment on the Heards' and Wells's wantonness claims, I concur only in the result. As to the remaining issues, I concur.
MURDOCK, Justice (concurring in the result in part and dissenting in part in case no. 1150119 and dissenting in case no. 1150118).
I concur in the result reached by the main opinion as it relates to the meaning of § 6-5-390, Ala. Code 1975, in case no. 1150119. I respectfully dissent as to the *664 merits of the other issues presented in both cases. Finally, I do not think a remand of the case to the trial court is necessary.
" 'Wantonness' has been defined by this Court as the conscious doing of some act or the omission of some duty while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." Ex parte Essary, 992 So.2d 5, 9 (Ala. 2007). I see no evidence of wantonness on the part of Timothy Joel Thomas in connection with his pulling into the intersection in which the accident occurred. For example, there is no evidence indicating that Thomas saw one or more approaching vehicles and decided to try and "shoot the gap," as did the defendant in Essary, a case in which this Court nevertheless found there to be insufficient evidence of wantonness.
Although there is much discussion in the main opinion of the fact that Thomas had a blood-alcohol content of .05% or .06%, I find little in that fact to support a wantonness claim, especially when the "legal limit" is .08% (and formerly was .10%). Of course, there is the added factor in this case of the prescription drug also taken by Thomas, along with testimony that the alcohol consumed by Thomas might enhance the tendency of the prescription drug to cause drowsiness. But by how much? Was Thomas aware that this might occur? What degree of impairment did Thomas experience above and beyond the normal impairing effect of a .05% or .06% blood-alcohol measurement ? I do not believe the records before us contain answers to these questions, leaving us to speculate as to the answers. To my mind, then, the evidence before us is not evidence of wanton conduct on the part of Thomas. Negligence, yes. But not wantonness. And in any event, not evidence from which a jury could find wantonness to be "clearly and convincingly" established.
The main opinion appears to deal with this deficiency, at least in part, by comparing and contrasting this case with Essary. It is true that this Court in Essary, in finding insufficient evidence of wantonness, took note of the lack of any evidence that the defendant was impaired. But the negative inference drawn by the main opinion from this notation in Essary is not warranted and was not intended by Essary. In particular, the fact that Thomas may not have been " 'in possession of his normal faculties' " does not readily correspond, but in fact would seem to be at odds with, the requisite " ' " 'consciousness ... that the doing or not doing of some act will likely result in injury.' " ' " Essary, 992 So.2d at 12, 9 (emphasis omitted) (quoting, respectively, Griffin Lumber Co. v. Harper, 252 Ala. 93, 95, 39 So.2d 399, 401 (1949), and Tolbert v. Tolbert, 903 So.2d 103, 114-15 (Ala. 2004), quoting, in turn, Ex parte Anderson, 682 So.2d 467, 470 (Ala. 1996), quoting in turn Lynn Strickland Sales & Serv., Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142, 145-46 (Ala. 1987) ). And again, my struggle with this issue only increases when one turns to the question whether there was sufficient evidence from which the jury could find wantonness under a "clear and convincing" evidence standard as required for the awards of punitive damages.[8]
Finally as to the merits, I cannot agree with the analysis offered by the main opinion with respect to the issue of the costs *665 awarded to the Heards and to Wells in relation to certain medical-deposition testimony.
Aside from my position as to the merits of various issues as discussed above, I do not believe it is necessary for the Court today to remand this cause to the trial court. Although we have said, as the main opinion notes, that a trial court is to express the reasons for its denial of a motion for a remittitur in a written order to give this Court the benefit of the trial court's evaluation of the verdict, that is not an ironclad rule. See Phillips Colleges of Alabama, Inc. v. Lester, 622 So.2d 308, 314 (Ala. 1993) (addressing the issue of whether a verdict that included a punitive-damages award was excessive and noting that "since Hammond [v. City of Gadsden, 493 So.2d 1374 (Ala. 1986) ], we have pointed out that it was never our intention to automatically remand every case in which excessiveness was at issue. Where the record on appeal is sufficient for this Court to review the excessiveness issue, as it is in the present case, a Hammond remand is not necessary." (citation omitted)). In this regard, it is also worth noting that we employ a de novo standard on appellate review of a punitive-damages award. See, e.g., Schaeffer v. Poellnitz, 154 So.3d 979, 986 (Ala. 2014).
On Return to Remand
PER CURIAM.
Timothy Joel Thomas appealed from judgments entered in favor of Randell Heard and Donna Heard and in favor of Laura Wells, as guardian ad litem and next friend of M.A., a minor. The Heards and Wells had separately sued Thomas alleging negligence and wantonness and seeking to recover damages for injuries the Heards and M.A. had suffered as the result of an automobile accident. A jury returned verdicts in favor of Randell Heard, awarding compensatory damages of $850,000 and punitive damages of $750,000; in favor of Donna Heard, awarding compensatory damages of $450,000 and punitive damages of $750,000; and in favor of Wells, awarding compensatory damages of $500,000 and punitive damages of $500,000. The trial court entered judgments on the jury's verdicts. Thomas argued that the jury's punitive-damages awards were excessive under the guideposts set out by the United States Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and the factors set out by this Court in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989), and requested a remittitur. The trial court denied Thomas's request for a remittitur without explaining its reasoning for doing so.
On appeal, this Court affirmed the judgments as to the compensatory-damages awards but remanded the cases with instructions for the trial court to enter orders in compliance with Hammond, 493 So.2d at 1379 ("[I]t is not only appropriate, but indeed our duty, to require the trial courts to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the [punitive] damages."). See Thomas v. Heard, 256 So.3d 644 (Ala. 2017). Pursuant to our instructions, the trial court, on May 24, 2017, after conducting a Hammond/Green Oil hearing, entered identical orders in both cases reaffirming the punitive-damages awards. The trial court made its return to this Court. The only issue now before this Court is whether the punitive-damages awards are, as Thomas contends, excessive. For the reasons given, we conclude that they are not.
Standard of Review
This Court reviews de novo an award of punitive damages. National Ins. Ass'n v. Sockwell, 829 So.2d 111, 135 (Ala. 2002).
*666 Discussion
In reviewing a punitive-damages award, we apply the factors outlined in Green Oil, supra, and Hammond, supra, within the guideposts set out in Gore, supra, as restated in State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).
The Gore guideposts are: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." State Farm, 538 U.S. at 418 (citing Gore, 517 U.S. at 575 ). The Hammond/Green Oil factors are:
" '(1) the reprehensibility of [the defendant's] conduct; (2) the relationship of the punitive-damages award to the harm that actually occurred, or is likely to occur, from [the defendant's] conduct; (3) [the defendant's] profit from [his] misconduct; (4) [the defendant's] financial position; (5) the cost to [the plaintiff] of the litigation; (6) whether [the defendant] has been subject to criminal sanctions for similar conduct; and (7) other civil actions [the defendant] has been involved in arising out of similar conduct.' "
Ross v. Rosen-Rager, 67 So.3d 29, 41-42 (Ala. 2010) (quoting Shiv-Ram, Inc. v. McCaleb, 892 So.2d 299, 317 (Ala. 2003) (paraphrasing the Hammond/Green Oil factors)).
In the present case, the trial court stated in its orders denying Thomas's motion for a remittitur:
"The parties agreed that there were basically three Hammond issues that applied to this case and one was not in dispute. The parties agreed that the difference between compensatory and punitive damages awarded by the jury was not a significant difference, and therefore, this factor is an indicator that the punitive damage[s] award was reasonable.
"The two issues counsel focused on in oral argument were:
"1) The degree of reprehensibility of the defendant's conduct.
"2) The financial position of the defendant."
The trial court considered all the Gore and Hammond/Green Oil factors but determined that only three were applicable. Thomas has not disputed this aspect of the trial court's orders. In making his argument that the punitive-damages awards should be remitted, Thomas addresses only the factors concerning the degree of reprehensibility of his conduct and his financial position. Accordingly, we will limit our analysis to the factors identified by the trial court as applicable in determining whether the awards of punitive damages were reasonable; nevertheless, our conclusion that no remittitur is warranted is ultimately based upon a review of all the relevant factors. See CNH America, LLC v. Ligon Capital, LLC, 160 So.3d 1195, 1211 (Ala. 2013) (setting forth analysis concerning only those Gore and Hammond/Green Oil factors addressed by the appellant).
First, this Court has recognized that the degree of reprehensibility of a defendant's conduct "is the single most important factor in the remittitur analysis." Pensacola Motor Sales, Inc. v. Daphne Auto., LLC, 155 So.3d 930, 949 (Ala. 2013) (citing BMW of North America, Inc. v. Gore, 517 U.S. 559, 576, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ). The trial court determined that Thomas's conduct was "extremely reprehensible" because of his voluntary intoxication.
*667 As noted in our opinion on original submission, there is a presumption under Alabama law that a person will not consciously do something that will cause himself or herself harm. See Ex parte Essary, 992 So.2d 5, 12 (Ala. 2007) (citing Griffin Lumber Co. v. Harper, 252 Ala. 93, 95, 39 So.2d 399, 401 (1949) ). However, this self-preservation presumption may be rebutted by, among other things, evidence indicating that the actor did not have possession of his or her normal faculties such that he or she did not appreciate the danger the actor's actions posed to himself or herself. Id. In the present case, clear and convincing evidence was presented that indicated that Thomas was voluntarily intoxicated to the point that he could not appreciate the danger his actions posed to himself; the self-preservation presumption in favor of Thomas was rebutted by the clear and convincing evidence of Thomas's voluntary intoxication presented by the Heards and Wells.[1] Thomas drove his vehicle, with a minor as a passenger, while he was voluntarily intoxicated to the point that he could not appreciate the danger to which this activity exposed him and all those around him. This conduct resulted in serious injuries to Thomas and three other people. Thomas's conduct evinces indifference and a reckless disregard for the health and safety of others. See Gore, 517 U.S. at 576 (noting, in considering the reprehensibility factor, that the defendant's conduct in that case "evinced no indifference to or reckless disregard for the health and safety of others"). Accordingly, the trial court properly found that Thomas's conduct was reprehensible; this factor weighs against remittitur of the punitive-damages awards.
Next, we note that the trial court determined that the ratio of punitive damages to compensatory damages awarded in these cases weighs against remittitur. We agree. Concerning this factor, this Court stated in Shiv-Ram, Inc. v. McCaleb, 892 So.2d 299, 317 (Ala. 2003) :
"Under [ BMW of North America, Inc. v.] Gore, 517 U.S. [559,] 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 [ (1996) ], and [ State Farm Mutual Automobile Insurance Co. v.] Campbell, 538 U.S. [408,] 419, 123 S.Ct. [1513,] 1521, 155 L.Ed.2d 585 [ (2003) ], we presume that [the plaintiff] has been made whole for injuries by the compensatory-damages award, but we do not consider that the ratio between the punitive-damages award and the compensatory-damages award of slightly less than three to one is unreasonable. See AutoZone[, Inc. v. Leonard], 812 So.2d [1179,] 1187 [ (Ala. 2001) ], approving a ratio of punitive damages to compensatory damages of 3.7:1, despite the fact that all of the $75,000 compensatory-damages award in excess of $3,000 necessarily related to mental anguish.... Subsequently, in Campbell, the United States Supreme Court observed that, based on prior caselaw, in practice few awards exceeding to a significant degree a single-digit ratio between punitive and compensatory damages would satisfy due process and acknowledged that in both Gore and *668 Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), it had approved a 4:1 ratio."
In the present case, the jury awarded Randell $850,000 in compensatory damages and $750,000 in punitive damages; the ratio of punitive to compensatory damages for Randell is 0.88:1. The jury awarded Donna $450,000 in compensatory damages and $750,000 in punitive damages; the ratio of punitive to compensatory damages for Donna is 1.67:1. The jury awarded Wells $500,000 in compensatory damages and $500,000 in punitive damages; the ratio of punitive to compensatory damages for Wells is 1:1. Accordingly, we find the ratio of punitive damages to compensatory damages to be reasonable for all three plaintiffs.
Lastly, the trial court determined that "the financial condition of [Thomas] was not a factor that diminished the appropriateness of the punitive damages awarded." After this Court remanded the cases for the trial court to enter orders consistent with Hammond, Thomas filed a motion for a remittitur. Thomas attached to his motion his own affidavit, but the affidavit was not signed by Thomas or notarized. Thomas's unsigned affidavit states that Thomas is currently unemployed, that he has not been employed since the accident, that he has no current source of income, no assets, and no money in his checking account, and that he is unable to satisfy any portion of the judgments entered against him. The Heards filed a motion to strike Thomas's affidavit on the basis that Thomas had failed to sign the affidavit.
In its orders on remand denying Thomas's motion for a remittitur, the trial court refused to consider not only the unsigned affidavit, but also all testimony offered by Thomas. The trial court held that Thomas "was not a credible witness." (Emphasis in original.) The trial court further stated:
"In oral argument before this court [Thomas's] counsel made the statement that [Thomas's] affidavit can be considered by the court as evidence in the case and proof of [Thomas's] financial condition, and verification was not needed. Plaintiffs urged [Thomas's] affidavit to be struck as not timely filed; however, it really doesn't matter. If the witness on the affidavit is found not to be a credible witness by the court, then verification of that information would be necessary to convince the court that the contents are true. Such was not provided, and, therefore, since [Thomas] is not credible, the court finds no evidence of [Thomas's] true financial condition, and, thus, concludes that the financial condition of [Thomas] was not a factor that diminished the appropriateness of the punitive damages awarded."
We note that the trial court did not strike Thomas's affidavit, as the Heards requested. Instead, the trial court simply found that Thomas was not a credible witness and that his testimony, in any form, was not credible. In Cameron v. State, 508 So.2d 304, 306 (Ala. Crim. App. 1987), the Court of Criminal Appeals stated that a trial court's finding that a witness "was not a credible witness"
"is binding on the court which 'can neither pass judgment on the possible truthfulness or falsity of testimony, ... nor on the credibility of witnesses.' Collins v. State, 412 So.2d 845, 846 (Ala. Crim. App. 1982) (citations omitted). 'When there is no showing to the contrary, the presumption is always in favor of correct action on the part of the trial judge.' Ballard v. State, 236 Ala. 541, 542, 184 So. 260 (1938)."
Thomas makes no argument in his brief before this Court concerning the trial court's finding that he was not a credible witness. Instead, ignoring that portion of *669 the trial court's orders, Thomas simply asserts that he offered testimony concerning his financial position. Because Thomas has not challenged the trial court's finding that he was not a credible witness, we will not consider this testimony. We further note, although not argued by Thomas, that the trial court did not err in refusing to give any weight to Thomas's unsworn affidavit testimony. In State Home Builders Licensure Board v. Stephens, 756 So.2d 878, 879 (Ala. Civ. App. 1998), the Court of Civil Appeals noted that an affidavit unsigned by the affiant "does not constitute admissible evidence."
Accordingly, there is essentially no evidence indicating Thomas's financial position. As a result, this factor weighs neither in favor of nor against a finding that the punitive-damages awards were excessive.
Conclusion
Having considered the trial court's remand orders in light of the Gore and Hammond/Green Oil factors, we conclude that no remittitur is needed and that the punitive-damages awards returned by the jury are appropriate and do not infringe upon Thomas's due-process rights.
1150118-AFFIRMED.
1150119-AFFIRMED.
Parker, Main, and Wise, JJ., concur.
Shaw and Bryan, JJ., concur in the result.
Stuart, C.J., and Bolin, Murdock, and Sellers, JJ., dissent.

Although M.A. was Foster's biological child and was living with Foster at the time of the accident, Foster testified that she did not have legal custody of M.A. Foster testified that she had legal custody of M.A. at the time of the trial, but did not specify on what date she had regained legal custody. Nothing in the record indicates who actually had legal custody of M.A. at the time of the accident or when Wells filed her underlying action. Wells states in her brief that, at the time of the accident and the commencement of her action, "legal custody of M.A. was lawfully vested in a third party, the Department of Human Resources." Wells's brief, at p. 58.

Alabama State Trooper Darren Pert testified that rumble strips, or "speed breakers," are used "to warn [motorists] of the intersection."

It appears that the "state law" to which Dr. Kalin was referring is § 32-5A-191, Ala. Code 1975, which states, in pertinent part:
"(a) A person shall not drive or be in actual physical control of any vehicle while:
"(1) There is 0.08 percent or more by weight of alcohol in his or her blood;
"(2) Under the influence of alcohol;
"(3) Under the influence of a controlled substance to a degree which renders him or her incapable of safely driving;
"(4) Under the combined influence of alcohol and a controlled substance to a degree which renders him or her incapable of safely driving; or
"(5) Under the influence of any substance which impairs the mental or physical faculties of such person to a degree which renders him or her incapable of safely driving."

The Heards and Wells also asserted claims of negligent entrustment against Peggy Anderson, the owner of the vehicle Thomas was driving at the time of the accident; those claims were later voluntarily dismissed without prejudice. The Heards also filed a claim for uninsured/underinsured-motorist benefits against Automobile Club Inter-Insurance Exchange. Automobile Club Inter-Insurance Exchange later opted out of the litigation.

Thomas does not challenge on appeal the trial court's denial of his motions for a JML concerning the Heards' and Wells's negligence claims against him.

Thomas argues that it required inferences to conclude that his blood-alcohol concentration was between .05% and .06%. However, both Dr. Kalin and Dr. Valentine, Thomas's own expert witness, testified to this fact. The jury was not required to infer that Thomas's blood-alcohol concentration was between .05% and .06%; that was an undisputed fact below. We note that Thomas raises some concern as to the weight to be accorded certain evidence; however, the weight to accord evidence is solely within the province of the jury. See Bell v. Greer, 853 So.2d 1015, 1018 (Ala. Civ. App. 2003) ("It is the jury's responsibility, not this court's, 'to determine the credibility of the evidence, to resolve conflicts therein, to find the facts, and to express its findings in its verdict.' Jones v. Baltazar, 658 So.2d 420, 422 (Ala. 1995).").

Section 12-21-144, Ala. Code 1975, states:
"The costs of any deposition introduced, in whole or in part, into evidence at the trial by the party taking it shall be taxed as costs in the case upon the certificate of the person before whom the deposition was taken; the costs of depositions in other cases shall be taxed as costs in the case only if the court so directs."

It should be noted that the appellate-review standard is not whether this Court can find wantonness to have been clearly and convincingly established, but rather whether the record is such that a jury could have done so. See, e.g., Ex parte Norwood Hodges Motor Co., 680 So.2d 245, 249 (Ala. 1996).

Thomas disagrees with this interpretation of the evidence. Essentially, Thomas is simply reasserting his argument on original submission that the Heards and Wells failed to present clear and convincing evidence that his conduct was wanton. Those arguments were considered and addressed on original submission and present nothing new for our consideration at this point in the proceedings. Other than arguing that there is no clear and convincing evidence of his wantonness, Thomas has presented no argument challenging the trial court's conclusion that his conduct was extremely reprehensible.